**In the Matter of Richard and Regina PICKUS, Debtors.**

**Richard PICKUS and Regina Pickus, Debtors, Plaintiffs,**

v.

**Dominic VITAGLIANO and Elena Vitagliano, Defendants.**

**Bankruptcy No. 5–80–00528.**
**Adv. Proceeding No. 2–80–0344.**

United States Bankruptcy Court,
D. Connecticut.

Dec. 31, 1980.

Francis X. Dineen and Joanne S. Faulkner, New Haven, Conn., for plaintiffs.

Mirto & Ketaineck, P. C., West Haven, Conn., for defendants.

## MEMORANDUM AND ORDER

ROBERT L. KRECHEVSKY, Bankruptcy Judge.

The issues raised in this proceeding revolve around Connecticut's state court procedure for the issuance without notice or a hearing of executions to dispossess tenants at any time during the six months following a state court judgment of possession. Because of the unusual history of this matter, the background, as disclosed at the trial of this proceeding, must be stated in some detail.

### BACKGROUND

On July 22, 1980, at 11:21 A.M., Richard Pickus (Pickus) and Regina Pickus (plaintiffs) filed a joint petition at the bankruptcy court in Bridgeport seeking relief under Chapter 7 of the Bankruptcy Reform Act. They showed 3656 Whitney Avenue, Ham-

den, Connecticut as their residence and listed among their creditors Dominic and Elena Vitagliano (defendants) with claims in the amount of $285.00 for "back rent" and $165.00 for "process charges". Pickus and the defendants had entered into a written lease for an apartment at 3656 Whitney Avenue, Hamden, Connecticut (premises), originally for a one-year term beginning September 1, 1978 at a monthly rental of $280.00. Pickus deposited security of $280.00 with the defendants. At the end of the one-year term, the lease was extended for an additional year at a monthly rental of $285.00. On October 30, 1979, the defendants caused a statutory notice to quit possession to be served upon Pickus. Thereafter, on November 21, 1979, abode service of a summary process complaint was made. This complaint contained allegations of Pickus' failure to pay monthly rent, the service of a notice to quit possession, Pickus' continued possession, and a request for relief in the form of immediate possession of the premises. Upon receipt of the summary process complaint, Pickus contacted Attorney Stephen R. Ketaineck (Ketaineck) who had issued the complaint on behalf of the defendants. Ketaineck testified that at a meeting held at his office on November 29, 1979, he told Pickus that he would not proceed with the eviction if all arrearages of rent, plus attorney's fees, provision for payment of which appeared in the lease, were satisfied. He advised Pickus that the attorney's fees and costs totaled $180.00. Ketaineck said he further advised Pickus that the monies to be received from Pickus would not be accepted as "rent", but as use and occupancy payments only, until all arrearage was made up. While Pickus did not recall any explanation of the differences between rent and use and occupancy payments, or any discussion of the matter of attorney's fees, he acknowledged that he was always aware that the summary process action would not be withdrawn until he had made full payment. He recalled that Ketaineck had stated during the November meeting that the pending eviction would be a "sword of Damocles over his head". Pic-

kus made a cash payment to Ketaineck of $1,000.00 and received a receipt which reads as follows:

> Received from Richard Pickus $1,000.00 for agreed upon use & occupancy for 3656 Whitney Ave., Apt. 39. Balance $300.00 for back rent plus an additional $285 for Dec. rent to be paid directly to Tom Vitagliano.

Ketaineck testified that he deducted $180.00 for the attorney's fees and costs and sent the balance of $820.00 to the defendants. Pickus made no further payments during December or January, and on February 5, 1980, Ketaineck filed a motion against Pickus in the state court action for default for failure to appear and for judgment of possession. The state court rendered a judgment of possession of the premises on February 7, 1980 and notice of such judgment was sent by the state court to Pickus. Ketaineck also requested and received from the state court an execution on the judgment dated February 14, 1980. On February 15, 1980, Pickus came to Ketaineck's office and left $485.00 for which the following receipt was issued.

> Received from Richard Pickus $285.00 for use & occupancy for the month of February & $200.00 towards arrearage of $585.00
> $200.00
> $385.00

### MIRTO & KETAINECK

By Sandra Peisano

In early April, 1980, Pickus sent Ketaineck a check for $285.00. On four different occasions, Ketaineck attempted to cash the check, but in each instance, the check was returned for insufficient funds in Pickus' bank account. Ketaineck finally returned the check to Pickus. The initial execution was returned to the state court by Ketaineck on May 1, 1980, and he requested and received a new execution dated May 9, 1980.[1] On May 12, 1980, Pickus appeared at Ketaineck's office and left the sum of $600.00 with the secretary and received from her the following receipt:

---

1. Under Conn.Gen.Stat. § 52–348, an execution is valid for up to 60 days after issuance.

Received from Richard Pickus $600.00— use & occupancy for the months of April & May—plus $30.00 towards Attorneys fee, for Apt. 39—3656 Whitney Ave., Hamden, Ct.

Pickus claims that after the May 12th payment, he believed he had paid all rent arrearages, owed a balance on attorney's fees only, and that he was no longer in jeopardy of being evicted. Mrs. Pickus testified that on July 3, 1980, she sent a money order to the defendants for $285.00 which she stated represented "rent" for the month of June, 1980. According to Ketaineck, in early July, 1980, the defendants, being unwilling to wait for Pickus to make further payment on the arrearage, decided to enforce their execution. Ketaineck stated that he had no personal contact with Pickus for about a month previously. A third execution was issued by the clerk of the state court on July 17, 1980. It was the use of this execution to dispossess Pickus that led to the instant litigation.

Under Connecticut court procedure, Chapter 832 of the Connecticut General Statutes, an execution for possession on a summary process judgment is prepared by the plaintiff or his attorney and sent to the clerk of the superior court for verification and signature by the clerk. Effective October 1, 1979, the Chapter was amended to provide that the execution could not issue after the expiration of one year from the date of the summary process judgment. In 1980, this time period was reduced to six months. No hearings are held and no affidavits by the plaintiff are required by the clerk of the court precedent to the issuance of the execution. The execution requires the sheriff to place the plaintiffs in possession by placing the occupants out of possession and removing their personal effects to the adjacent sidewalk. However, the sheriff must, at least 24 hours prior to the eviction "use reasonable efforts to locate and notify the [occupants] of the date and time such eviction is to take place . . .". Conn.Gen.Stat. § 47a–42(b).

Ketaineck delivered the execution and a copy to a Connecticut sheriff (Burgarella) on Friday, July 18, 1980. On the following Monday, July 21, 1980, Burgarella typed a notice on the back of one of the executions to the effect that Pickus must vacate the premises or an eviction would take place. He then placed this copy of the execution in an envelope with Pickus' name and address on the envelope. Burgarella gave the envelope to a deputy sheriff (Russo) to deliver to the premises on July 21st. Russo stated that he placed the envelope under a screen door at the premises, no one being at home. After Russo notified Burgarella of the delivery of the envelope, Burgarella contacted officials of the Town of Hamden to notify them of the pending eviction. He requested a truck to be made available at the premises at noon on the 23rd of July. On that day, Burgarella went to the premises and proceeded to empty the premises by placing all of the Pickus' furniture, clothing and other personal effects in the yard in front of the premises. From there, most of these personal effects were removed to a warehouse.[2] Shortly thereafter, the plaintiffs came upon the scene, having been called there by a neighbor who had witnessed the dispossession. The plaintiffs denied ever receiving the execution notice which Russo said he served. As noted, Pickus's attorney had 24 hours earlier filed a petition for relief in the bankruptcy court. Pickus called his attorney who, in turn, called Ketaineck, advising him that the petition for relief had been filed and that the execution should not proceed further. Ketaineck replied that dispossession had already taken place, and he had no authority to put the plaintiffs back in possession. Ketaineck testified at the trial that had he known about the existence of the petition

---

**2.** Burgarella's original "Return of Service" of the execution which, at the date of trial, was in Ketaineck's possession and not filed with the state court, recites that "on 7/21/80 at 12:30 P.M., [he] notified the Defendant", that he thereafter notified "the chief executive officer of the town on 7/21/80 at 1 P.M." and that "on 7/23/80, at 12:30 P.M. the Defendants' possessions I put out on the adjacent sidewalk, street or highway and put the Plaintiff(s) in possession of said premises."

for relief, he would have notified the sheriff to stop the dispossession. At the beginning of the trial, the plaintiffs and the defendants stipulated that on July 22, 1980, Pickus owed a total of $450.00 to the defendants, without the parties agreeing as to whether this sum was to be characterized as a debt for rent, or use and occupancy, or attorney's fees and costs.

Extensive testimony was received as to considerable damage to the personal property of the plaintiffs which occurred when this property was taken from the premises, as to the attendant expense imposed on the plaintiffs in having to live in motels and eat in restaurants while they looked for another apartment, and as to the pain and suffering caused by what they described as the humiliating experience of seeing the contents of their home strewn over the sidewalks of Hamden.

On August 25 and September 25, 1980, the plaintiff's attorney sent letters to Ketaineck requesting the return of the original security deposit of $280.00. The defendants have not responded to these requests.

## THE COMPLAINT

The complaint, as amended, filed by the plaintiffs alleges that the actions of the defendants were in violation of the automatic stay provisions of 11 U.S.C. § 362(a) (1st count); constituted unlawful collection practices and unfair trade practices under Connecticut statutes (2nd count); deprives the plaintiffs of their civil rights, privileges, or immunities under color of state law in violation of 42 U.S.C. § 1983 (3rd count); and that the defendants have failed to return the security deposit in violation of

Conn.Gen.Stat. § 47a–21(d) (4th count). The plaintiffs' prayer for relief seeks an order holding the defendants "and their attorneys" in contempt, a writ of restitution enjoining the defendants to grant the plaintiffs possession of the premises, actual and punitive damages, and an order for attorney's fees and costs.

## DISCUSSION

The claim of the plaintiffs in the first count is that the defendants' actions on July 23, 1980 violated the automatic stay provisions of 11 U.S.C. § 362(a).[3] The plaintiffs request as relief an order holding the defendants and their attorneys in contempt. They contend that they are entitled to substantial actual and punitive damages plus imposition of attorney's fees. When the plaintiffs filed their petition for relief, they listed assets totaling $5,498.59, all of which were claimed as exempt under 11 U.S.C. § 522(d). Included among these assets were household goods, appliances, clothing, and furnishings for $2,500.00 and a rental deposit of $280.00. No lease or right of possession was listed. Under the provisions of 11 U.S.C. § 541, property of the estate includes all interest of the debtor in property, and such provisions are broad enough to include the debtors' possession of the premises on the date of filing.[4] Thus, the automatic stay provisions of § 362(a) which became effective upon the filing of the petition for relief clearly prohibited interference with the plaintiffs' possession of the premises. The defendants' actions in utilizing the execution were therefore in violation of the provisions of § 362(a). However, there is no question that the defendants at the time the eviction took place on July 23, 1980 had no knowledge of the filing of the petition

---

**3.** *Section 362. Automatic Stay*

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of—

.    .    .    .    .

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate;

.    .    .    .    .

**4.** *Section 541. Property of the Estate*

(a) The commencement of a case . . . creates an estate. Such estate is comprised of all the following property, wherever located:

(1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case.

for relief by the plaintiffs on July 22, 1980. This being so, there can be no basis for finding the defendants in contempt. "A person cannot be held in contempt of an order about which the person had no knowledge". *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 51 (2nd Cir. 1976). At the same time, the law is also well settled that actions taken in violation of the provisions of bankruptcy laws are void. *Kalb v. Feuerstein*, 308 U.S. 433, 438, 60 S.Ct. 343, 345, 84 L.Ed. 370 (1940). Although the complaint requested a writ of restitution to gain possession of the premises, in their pre and post-trial briefs, the plaintiffs do not press this request and seek, instead, money damages.[5] There being no basis for a finding of contempt, and repossession being neither requested nor feasible, the court can discern no basis for the monetary relief requested by the plaintiffs, and no authorities supporting such monetary relief have been cited to the court.[6]

The second count in the complaint alleges unlawful collection practices and unfair trade practices in violation of Conn.Gen. Stat. § 36–243a, et seq. and § 42–110a, et seq. The plaintiffs devoted little attention to this count in their pre-trial brief and none in the post-trial memorandum. But to the extent that the court can follow the plaintiffs' arguments, their claim depends upon the court first concluding that there was a knowing violation of the § 362 stay by the defendants in the carrying out of the execution of the judgment of possession. As previously stated, in the absence of any knowledge by the defendants of the filing of the plaintiffs' petition in the bankruptcy court, there can be no finding of willfulness as to the defendants' actions and no basis for recovery. Further, the plaintiffs have not introduced into evidence any of the regulations of the Connecticut Banking Commissioner or the Connecticut Commissioner of Consumer Protection which establish the forbidden unfair or unlawful practices. Conn.Gen.Stat. § 52–166.

In their third count, the plaintiffs allege that the defendants, in issuance of the execution dispossessing the plaintiffs, violated the plaintiffs' civil rights by denying them due process of law under color of state statute, and that defendants are thus subject to claims for actual and punitive damages pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.[7] Granting the fact that § 1343 invests federal district courts with jurisdiction to hear § 1983 actions, a threshold question not addressed by the parties must be resolved by the court—viz, does jurisdiction lie with this court to hear such an action? More precisely, does the third count adequately meet the requirement of 28 U.S.C. § 1471 that it constitute "a civil proceeding arising under title 11 or arising in or related to [a case] under title 11"?[8] I

---

**5.** There was some testimony that the day after the eviction the plaintiffs returned to the premises to retrieve certain personal effects and were denied access to the premises. It does not appear that the plaintiffs were then seeking repossession of the premises.

**6.** Obviously, this determination does not deal with any claims of negligence that the plaintiffs may have against unnamed parties for injuries during the dispossession proceedings.

**7.** *Section 1343. Civil Rights and Elective Franchise.*

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: . . .

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

*Section 1983. Civil Action for Deprivation of Rights.*

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**8.** *Section 1471. Jurisdiction.*

conclude that it does, and that this court has jurisdiction to determine the issues raised by the § 1983 allegations which are properly before me. The adoption of the Bankruptcy Reform Act made important alterations in the jurisdiction of bankruptcy courts by extending their reach to matters formerly required to be heard elsewhere. The court notes that at first blush, the claim of an alleged § 1983 violation arising by reason of *post-petition* acts appeared to lack sufficient connection with the case to permit determination on the merits here. On closer analysis, however, it is clear that the plaintiffs are alleging money damages to property rights which were part of the estate and thereafter, both inferentially and actually, claimed as exempt by the plaintiffs. The legislative history clearly indicates that the Bankruptcy Reform Act codifies a rejection of the rule in *Lockwood v. Exchange Bank*, 190 U.S. 294, 23 S.Ct. 751, 47 L.Ed. 1061 (1903) to the effect that once exemptions had been set aside, the bankruptcy court no longer had jurisdiction over such property to protect it against the claims of creditors.

Paragraph (1) [of 11 U.S.C. § 541(a)] has the effect of overruling *Lockwood v. Exchange Bank*, 190 U.S. 294 [23 S.Ct. 751, 47 L.Ed. 1061] (1903), because it includes as property of the estate all property of the debtor, even that needed for a fresh start. After the property comes into the estate, then the debtor is permitted to exempt it under proposed 11 U.S.C. 522, and the court will have jurisdiction to determine what property may be exempted and what remains as property of the estate. The broad jurisdictional grant in proposed 28 U.S.C. 1334 [28 U.S.C. 1471(b) in the House Report] would have the effect of overruling Lockwood independently of the change made by this provision. H.Rep.No.95–595, 95th Cong., 1st Sess. 368 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 82 (1978).

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.

It follows that if a creditor by his post-petition acts impairs the exemptions of a debtor, the bankruptcy court has jurisdiction to resolve the ensuing dispute, which dispute goes "to the very heart of the bankrupt's ability to make a fresh start . . . ." 1 *Collier on Bankruptcy*, (15th ed.) ¶ 3.01 at 3–48. In the proceeding at bar, the plaintiffs also claim damages arising from living expenses incurred and pain and suffering inflicted as a result of eviction by the defendants, as well as punitive damages, all pursuant to § 1983. While these latter claims for damages go beyond injury to property, the issues are inextricably interrelated. In the absence of a specific prohibition, and in view of the congressional purpose in expanding the jurisdiction of the bankruptcy courts to minimize the delay and expenses attendant upon divided jurisdiction, I conclude that this court has jurisdiction over all facets of the plaintiffs' claims for damages pursuant to § 1983. H.Rep.No.95–595, 95th Cong. 1st Sess. 445 (1977); S.Rep.No. 95–989, 95th Cong., 2d Sess. 153 (1978), U.S. Code & Admin.News 1978, p. 5787.

■ Plaintiffs' claim for relief under § 1983 is two-pronged. First, the plaintiffs allege that the defendants, by allowing them to remain in possession after obtaining judgment for possession, and accepting payments for arrearages of rent, created a new tenancy in the plaintiffs which was violated by an improper use of the execution. The plaintiffs claim that a bad faith or improperly motivated use of the Connecticut execution statute constitutes a violation of their civil rights under color of state law. On the question of bad faith or improper motivation, I find that although the record is not without ambivalence given the varying language in the receipts issued to Pickus by Ketaineck's office, nevertheless, the preponderance of the evidence indi-

(c) The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.

cates that the plaintiffs knew at all times that their continued possession of the premises depended on a complete payment of all arrearages. Pickus acknowledged that Ketaineck told him that until he was fully paid up, "a sword of Damocles" in the form of potential dispossession threatened. The record further establishes that the plaintiffs never became entirely paid up with respect to arrearages owed. In view of Ketaineck's testimony that the delay in enforcing the execution arose from an attempt to allow the plaintiffs to become current in rent and to create no new tenancy until that occurred, the plaintiffs have not proved the existence of a new lease between them and the defendants.[9] The state court judgment of possession dated February 7, 1980 terminated the plaintiffs' right to possession and their actual possession could be terminated under Connecticut statute at any time within six months of judgment by an execution upon said judgment. While the court does not condone the callousness with which the dispossession was carried out, I hold that the plaintiffs have not borne their burden of proving the defendants' bad faith or improper motive in the use of Conn.Gen. Stat. § 47a–42(b).

The plaintiffs also claim that their constitutional rights to due process are violated by the statutory procedures of the State of Connecticut which allows eviction without notice or hearing when facts could have arisen between the entry of judgment and the issuance of the execution which would enable an occupant to remain in possession of the premises. An example of such circumstances would be, as here, where bankruptcy has intervened. Whatever validity this argument might have, it cannot be reached due to the holding in *Tucker v. Maher*, 497 F.2d 1309 (2nd Cir. 1974) *cert. denied* 419 U.S. 997, 95 S.Ct. 312, 42 L.Ed.2d 271 (1974). In *Tucker*, a property owner challenged the constitutionality of Connecticut's materialmen's lien and prejudgment

attachment statutes and sought to recover damages in a § 1983 action from persons who had utilized the Connecticut statute. The district court dismissed the action and the Court of Appeals affirmed, holding that a § 1983 action *for damages* does not lie where the constitutional violation asserted is claimed under a statute not yet declared constitutionally invalid. In *Tucker*, the named defendants included the lienors and attaching creditors, corporate and individual, their attorney, and the deputy sheriff who served the writ. Concluding that no constitutional tort had been committed, the Court of Appeals observed:

> The corporate and individual appellees apparently acted on the advice of counsel and no evil intent can be properly ascribed to them. See *Restatement of Torts, supra,* § 675. Comment on clause (b) (1938).... [Utilized were] statutory procedures which were the traditional legal processes employed by contractors and materialmen to collect debts incurred in the course of their business activities. The statutes had not then nor have they been since declared unconstitutional.... Constitutional law, particularly in this difficult and confusing area of state action and due process, is hardly predictable with any degree of certainty. The very recent history of such constitutional litigation in this circuit should convincingly indicate that the role of the prophet is precarious at best. We think, as a majority of this court did in *Fleming v. McEnany, supra* [491 F.2d 1353], that counsel here had a right to rely on the statutory law of the jurisdiction which had not been repealed or replaced, or declared unconstitutional by any competent court at the time it was utilized.... State legislation is under increasing constitutional attack but until the assault is successful, attorneys should be entitled to rely upon the presumption of constitutionality. *Id.* at 1315–16.

---

**9.** *Casner v. Resnick,* 95 Conn. 281, 287, 111 A. 68 (1920).

"If, as the landlords claimed, the lease had already been terminated, they had a right to refuse a belated tender of rent, and to notify

the tenant that it would be accepted only as compensation for use and occupation. If the tenant paid the money after that notification, the *status quo* was preserved."

No court having previously found the Connecticut eviction statute unconstitutional, the defendants cannot be liable for damages for exercising their rights pursuant thereto. Whatever constitutional infirmities may exist in Connecticut's post-judgment remedy of execution upon summary process, such infirmities must await another time or place for their exposure.[10]

■ With respect to the plaintiffs' fourth count, which alleges that defendants have refused to return the security deposit as requested, the court does not recall any testimony from the defendants as to what they claim to be the status of this money and no mention of this count is contained in either the plaintiffs' or the defendants' briefs. The sole testimony is that of Pickus, to the effect that he never received back the deposit after two requests therefor. Accordingly, pursuant to Conn.Gen. Stat. § 47a–21(d)(2),[11] judgment for twice the value of the security deposit, or $560.00, shall enter against the defendants.

This memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 752 of the Rules of Bankruptcy Procedure.

---

10. *But see Endicott-Johnson Corporation v. Encyclopedia Press, Inc.*, 266 U.S. 285, 45 S.Ct. 61, 69 L.Ed. 288 (1924) which denied that due process requires "that a defendant who has been granted an opportunity to be heard and has had his day in court, should, after a judgment has been rendered against him, have a further notice and hearing before supplemental proceedings are taken to reach his property in satisfaction of the judgment". *Id.* at 288, 45 S.Ct. at 62.

11. *Section 47a–21(d)(2).*
　　Upon termination of a tenancy, any tenant may notify his landlord in writing of such tenant's forwarding address. Within thirty days after termination of a tenancy, each landlord other than a rent receiver shall deliver to the tenant or former tenant at such forwarding address either the full amount of the security deposit paid by such tenant plus accrued interest as provided in subsection (i) of this section, or a written notification advising the tenant of the nature of any damages suffered by such landlord by reason of such tenant's failure to comply with such tenant's obligations. If such landlord delivers such notification, the balance of any security deposit and accrued interest due and a written statement itemizing the nature and amount of damages shall be delivered to such tenant at his forwarding address within sixty days after termination of the tenancy. Any such landlord who violates the provision of this subsection shall be liable for twice the value of any security deposit paid by such tenant.