In the Matter of ADANA MORTGAGE BANKERS, INC., Debtor.

Bankruptcy No. 80–00324A.

United States Bankruptcy Court, N. D. Georgia.

June 8, 1981.

David Epstein, Kenneth Oestreicher, Attys., Civ. Div., Dept. of Justice, Washington, D.C., for plaintiff.

Carr, Abney, Tabb & Schultz, Benjamin C. Abney, Atlanta, Ga., for defendant.

## OPINION

WILLIAM L. NORTON, Jr., Bankruptcy Judge.

On August 14, 1980, this court issued an opinion and order finding the Government National Mortgage Association ("GNMA") and certain officials of GNMA in contempt of the order for relief and automatic stay of this court in this Chapter 11 case. —— B.R. ——. On November 7, 1980 a hearing was held to determine which defendants, if any, should be charged with sanctions and if so what sanctions were appropriate.[1]

GNMA argued orally and through brief filed October 31, 1980, that: (1) clarifying legislation recently enacted on October 8, 1980, made it clear that GNMA did not violate the automatic stay either by issuing the termination letter on February 6, 1980, or by making demand on the custodial banks on March 3, 1980; (2) GNMA officials acted in good faith and in the belief that they were exempt from the Bankruptcy Code when they acted on February 6, 1980, and on March 3, 1980, and that this belief was vindicated by the clarifying legislation; (3) attorneys' fees could not be awarded against an agency of the United States or its officials; (4) GNMA should not have to bear the entire cost of the contempt litigation; and (5) the First National Bank of Atlanta ("FNBA") had not shown that it was entitled to recover its legal costs from GNMA.

This court found GNMA in contempt in the order of August 14, 1980, because its actions of February 6, 1980, and March 3, 1980, affecting property in possession of the Chapter 11 debtor, violated the provisions of the automatic stay, 11 U.S.C. § 362. The court rejected GNMA's argument that it and its officials acted in a good faith belief that § 306(g) of the National Housing Act, 12 U.S.C. § 1721(g), exempted GNMA from the provisions of the Bankruptcy Code

1. The court after the hearing to consider evidence and oral argument requested briefs. GNMA filed a prehearing brief on October 31, 1980. The debtor filed no brief, but introduced an affidavit as to legal charges connected with the defense of the actions by GNMA to seize property in the possession of the Chapter 11 debtor and in bringing the contempt proceeding. The court has deferred a ruling on sanctions for contempt until now for several reasons, primarily that the issue was not a pressing matter in the then posture of the Chapter 11 case, and a ruling later in the Chapter 11 case when all issues and a plan had been considered might be more appropriate. It was thought that further developments incident to the sale of the servicing portfolio and the confirmation of a plan might better reveal the good faith alleged by GNMA and possibly purge the contempt by GNMA in its initial violations of the stay.

Instead, recent information coming to the court concerning actions by GNMA demonstrate the fallacy of this court's gratuitous observations at Tr. 129–30, and the necessity for a finding of sanctions against this federal agency.

The consistent attitude of GNMA expressed in this case is that its contract and relationship with this debtor is exempt from the Bankruptcy Code and the automatic stay. GNMA argues that the importance of this national housing guarantee program exempts GNMA's paternalistic, protective actions and its view of Section 306(g) vis-a-vis the Bankruptcy Code are insufficient arguments to support the waiver of sanctions for the violations of the protective automatic stay of this debtor. The conscientious commitment of the able administrators of the guaranty program mentioned at Tr. 129–130 is counterbalanced by a callous attitude toward this debtor and other mortgage issuers and a disrespect for the applicable bankruptcy laws and a disregard for the policy and intentions of Congress as to Bankruptcy Reform Act.

(Contempt Opinion, p. 14). However, GNMA argues that a recent clarifying amendment to § 306(g), enacted October 8, 1980, which was after the March hearing and August order of this court, makes it clear that Congress intended to exempt GNMA's enforcement of its contracts from the provisions of the Bankruptcy Code.

Prior to its amendment, § 306(g) read in relevant part as follows:

> Any Federal, State or other law to the contrary notwithstanding, the Association [GNMA] is hereby empowered, in connection with any guaranty under this subsection, whether before or after any default, to provide by contract with the issuer for the extinguishment upon default by the issuer, of any redemptions, equitable, legal, or other right, title, or interest of the issuer in any mortgage or mortgages constituting the trust or pool against which the guaranteed securities are issued; and with respect to any issue of guaranteed securities, in the event of default and pursuant otherwise to the termination of the contract, the mortgages that constitute such trust or pool shall become the absolute property of the Association subject only to the unsatisfied rights of the holders of the securities based on and backed by such trust or pool. 12 U.S.C. § 1721(g).

On October 8, 1980, the Housing and Community Development Act of 1980 was signed into law. The Congress approved the bill on September 30, 1980. Section 335 of this Act amends Section 306(g) of the National Housing Act as follows:

> SEC. 335. Section 306(g) of the Federal National Mortgage Association Charter Act is amended—
>
> (1) by striking out "Any Federal, State, or other law to the contrary notwithstanding, "the" in the fourth sentence and inserting in lieu thereof "The"; and
>
> (2) by inserting after the fourth sentence the following new sentence: "No State or local law, and no Federal law (except Federal law enacted expressly in limitation of this subsection after the effective date of this sentence), *small preclude or limit the exercise* by the Association of (A) its power to contract with the issuer on the terms stated in the preceding sentence, (B) its rights to enforce any such contract with the issuer, or (C) its ownership rights, as provided in the preceding sentence, in the mortgages constituting the trust or pool against which the guaranteed securities are issued." [Emphasis supplied.]

GNMA argues that this language makes it clear that no law except one passed after October 8, 1980, can "preclude or limit" GNMA's power to enforce its contracts with issuers; and then only if the law is expressly in limitation of GNMA's authority to enforce its contracts. GNMA argues that the Bankruptcy Code and the automatic stay of Section 362, by virtue of the foregoing language, are expressly excluded as limitations on GNMA's power to enforce its contracts; that GNMA is exempt from the Bankruptcy Code, and that the automatic stay is inapplicable to any action that GNMA may choose to take respecting an issuer's contract. *In re Whitcomb & Keller Mortgage Company, Inc.*, 8 B.R. 83, 7 BCD 147 (Bkrtcy.N.D.Ind.1980).

GNMA argues that, being so clearly exempt by the October 8 amendment, the only question for this court regarding this contempt action is whether Congress by the 1980 Housing Act intended to grant GNMA new authority or to clarify powers that already existed. GNMA argues that the legislative history demonstrates that Congress in the Housing Act of 1980 was merely clarifying GNMA's power and exemption from the provisions of the Bankruptcy Code. H.R.Rep.No.96–979, 96 Cong., 2d Sess., 49 (May 15, 1980), provides:

> In amending the bankruptcy laws in 1978, Congress amended and repealed many Federal Statutes to conform these Federal laws to the Bankruptcy Code. However, Congress did not expressly amend or repeal Section 306(g). Because the Committee feels that GNMA's authority to terminate issue status under

Section 306(g) is essential to effecting the GNMA guaranty of timely payment, it has acted to *clarify* that the changes accomplished by the new Bankruptcy Code are not intended to limit that authority. [Emphasis supplied.] [2]

GNMA argues that this quote from the House Report shows that GNMA had the power to unilaterally enforce, without com-

ing before the Court, its contracts with the Chapter 11 debtor and assert by seizure its claims against debtor's attorney.

This is not so. The quoted citations and argument of GNMA on the effect of § 306(g) are absolutely contradictory to the definition of property of the estate and the jurisdiction of this Court over such property

---

2. This statement seems verbatim of one of the arguments of GNMA made in the contempt proceeding that because Title III of the Bankruptcy Reform Act of 1978 failed to specifically repeal Section 306(g) of the Housing Act as it did with many federal Acts, the Bankruptcy Code was inapplicable to Section 306(g). The above is the quote cited by GNMA. A more complete part of the House Report is:

AUTHORITY TO PROTECT FEDERAL GOVERNMENT'S INTEREST

Under section 306 of the National Housing Act, GNMA guarantees the timely payment each month of principal and interest on securities backed by groups or pools of FHA-insured or VA or FmHA-guaranteed mortgages. Private lenders issue and sell these mortgage-backed securities and promptly use the sales proceeds to generate additional mortgage loans for pooling. Because of the popularity of these securities with investors, the GNMA Mortgage-Backed Securities program has become critically important to the financing of housing for moderate income families. The program makes available the necessary capital for over two-thirds of the single-family mortgages insured by FHA or guaranteed by VA. More than $95 billion in securities have been issued since the program's inception in 1970. A good deal of the program's success is attributable to the predictability of a mortgage-backed security's income stream; holders of the securities are assured timely payment each month of their shares of principal and interest due under the pooled mortgages whether or not such sums are actually collected from the mortgagors. Issuers are obligated to advance to their pools any shortfalls in collections of mortgagors' scheduled payments. If an issuer is unable to make the requisite advances, GNMA pays the holders under its guaranty.

GNMA's authority to supervise issuers and minimize losses stemming from an issuer's failure or inability to make full and timely payments to securities holders is provided under section 306(g) of the National Housing Act. This authority is provided notwithstanding any Federal, State, or other law to the contrary. On the basis of this authority,

GNMA reserves the right in all of its guaranty agreements with issuers to terminate the issuer's administrative functions in the event of the issuer's failure to maintain sufficient net worth under GNMA's requirements, or if the issuer fails to meet other contractual requirements.

In amending the bankruptcy laws in 1978, Congress amended and repealed many Federal statutes to conform these Federal laws to the Bankruptcy Code. However, Congress did not expressly amend or repeal section 306(g). Because the Committee feels that GNMA's authority to terminate issuer status under section 306(g) is essential to effecting the GNMA guaranty of timely payment, it has acted to clarify that the changes accomplished by the new Bankruptcy Code are not intended to limit that authority. The Committee has further amended section 306(g) of the National Housing Act to reinstate the enforceability of the rights and remedies provided for in FHA-approved mortgage instruments and in regulatory agreements between the Secretary of HUD and mortgagors of insured mortgages. This provision was deleted under the 1978 Bankruptcy Act. The enforceability would extend to FHA insured or formerly insured mortgages on multifamily projects only. Under the amendment, Federal bankruptcy law would not affect the exercise of such rights and remedies in the absence of future amendment of title II of the United States Code in specific derogation of this provision.

The bill also amends title V of the National Housing Act to enable the Secretary to proceed to acquire a multifamily project notwithstanding the mortgagors filing of a bankruptcy petition. This amendment is necessary to enable the Secretary to avoid an additional and substantial delay in acquisition and disposition of a multifamily project caused by the mortgagor's filing a petition in bankruptcy. The consequences of such a delay include both realization by HUD of greater losses to the FHA Insurance Fund and a loss of capacity to protect the interests of tenants of insured multifamily housing projects.

and over the debtor. 11 U.S.C. §§ 541; 301; 28 U.S.C. § 1471. These provisions and the stay provisions have not been amended. Thus, they must prevail in any arguable conflict with Section 306(g) of the Housing Act. The House Report should not be used to construe an otherwise clear statutory provision. Moreover, the congressional report of one committee regarding legislation in one area of law is doubtful authority for interpreting congressional intent on a prior law drafted and considered by another committee of Congress. This court recognizes the cross-currents of congressional interests and opinions, and the influences of vested interests, including federal agencies, upon committees and committee staffs. It also recognizes how comments sometimes mysteriously get into committee reports. The comments of one committee report regarding a bill unconnected to a prior act of another committee and another Congress are of questionable weight in construing congressional intent.

The October 8, 1980 amendment to Section 306(g) is quite clear in that it specifies that no prior federal law may "preclude or limit the exercise" by GNMA of its *substantive rights* under an issuer's contract. The version of Section 306(g) in effect prior to the October 8 amendment, similarly gave GNMA authority, despite any federal, state or other law to the contrary, to establish by contract the *substantive rights* of the issuer under the guaranty agreement. The language is different, but the powers of GNMA regarding the issuer, the guaranty agreement and the Bankruptcy Act are not

materially stronger than the prior version of Section 306(g). Certainly, this amended provision of October 8 should not be read to provide a cart blanc, automatic exemption to GNMA from the provisions of 28 U.S.C. 1471, 11 U.S.C. 362(a), and 541. The initial stay in a bankruptcy case is a limited one, always subject to termination or modification by the Bankruptcy Court upon a proper showing. The stay is procedural, remedial, not substantive. *Continental Ill. Nat. Bank & Trust Co. v. Chicago R. I. & Par. Ry.*, 294 U.S. 648, 676, 681, 55 S.Ct. 595, 608, 79 L.Ed. 1110 (1935).[3] If jurisdiction of the Bankruptcy Court is proper over an issuer under contract with GNMA, the Section 541 property in the possession of the debtor, i. e., the guaranty agreement, the accounts, the mortgages, are within the jurisdiction of the court, and the Section 362(a) stay is applicable to that property and thus to GNMA in respect to any action to exercise its substantive rights in respect to that property. Being subject to the stay in no way precludes or limits "the exercise" by GNMA of its substantive rights in the guaranty agreement with the Chapter 11 debtor. GNMA may exercise its Section 306(g) rights through a proper action against the debtor in the Bankruptcy Court to obtain relief from the stay.

The general policy of the Bankruptcy Reform Act of 1978 is to initially effect universal jurisdiction and then allow the court to grant relief. The conclusion of the 95th Congress,[4] the Bankruptcy Commission,[5]

---

3. See Advisory Committee's Note to Bankruptcy Rule 601: "No substantive right is abridged, enlarged or modified by a limited stay of the enforcement of a lien against property in the court's custody ..."

In another context regarding the Chapter 13 co-debtor stay, the House Report to accompany H.R.8200, H.R.Rep.No.95–595, 95th Cong., 1st Sess., Sept. 8, 1977, 123, U.S.Code Cong. & Admin.News 1978, p. 5787, 6084, stated: "The stay is finely tuned. It is not overbroad, and is directed at only the problems that have arisen under present law. *It does not affect the creditor's substantive rights in any way.* It operates

only as a procedural delay. The creditor remains entitled to full satisfaction." (Emphasis supplied).

4. H.R.Rep.No.95–595, *supra*, p. 340.

5. Commission Report, Part II, at 117–123: "The concept that the property ... is in custodia legis from the time of the filing of the petition and that interference with that custody can be enjoined by the bankruptcy court is fundamental ...." *Id.* at 121.

and the Bankruptcy Rules,[6] is that the automatic stay is fundamental to the orderliness of a bankruptcy statute.[7] It is coupled with the necessary pervasive jurisdiction,[8] the pervasive definition of property of the debtor,[9] and the pervasive coverage of entities including all levels of the federal government.[10] Without the automatic stay the statutory rights of debtors and creditors would be in disarray. The rights conferred by the bankruptcy statute upon debtors and creditors would be virtually meaningless. Without the stay, the debtor and creditors would be confronted with a race to the courthouse, and the inequity of resisting actions of creditors having more powerful resources; indeed, the debtor and less powerful creditors would be virtually left with the law of the jungle.[11]

■ Thus, it is the established public policy of Congress expressed in the Bankruptcy Code to substitute for the chaos of insolvency a structured statute with a balancing of rights of debtors and creditors. Into this statutory framework, the Congress has decreed that all property and property rights of and in the possession of the debtor at the time of filing pass to the jurisdiction of the Bankruptcy Court and under the protection of the automatic stay. All creditors and parties of interest of the debtor are covered by the jurisdiction of the Bankruptcy Court. All parties desiring relief from the jurisdiction shall petition the court for relief.[11a] The October 8, 1980 amendment to the Housing Act of 1980 did not carve out an exception or clarify a prior exception in

**6.** See Bankruptcy Rule 601, Advisory Committee Note.

**7.** (a) "The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors . . . ." H.R.Rep.No. 95–595, 95th Cong., 1st Sess., 340–42 (Sept. 8, 1977), U.S.Code Cong. & Admin.News 1978, p. 6296.
(b) It has been stated that "consumers who deal with large financial institutions do so at an extreme disadvantage . . . [no] individual in the United States should be confronted with a threat to literally denude him and his family unless he acquiesces to the terms of a stringent new commitment which violates the public policy of the bankruptcy laws." Id. 173, U.S.Code Cong. & Admin.News 1978, p. 6134.
(c) "The stay is an important aspect of bankruptcy protection, and is an element of the debtor's fresh start . . . ; for the ailing business, the stay gives the business a breathing spell and time to work constructively with its creditors, . . . and prevents some creditors from obtaining preferential treatment by quick action . . . ."
"Creditors may obtain relief from the stay if their interests would be harmed by continuance of the stay." Id. pp. 174–175, U.S.Code Cong. & Admin.News 1978, p. 6135.

**8.** 28 U.S.C. § 1471.

**9.** 11 U.S.C. § 541. The Bankruptcy Code definition of property brings "anything of value that the debtor's have into the estate." Id. at 176, U.S.Code Cong. & Admin.News 1978, p. 6136. "This includes all interests, such as interest in real or personal property, tangible and intangible property, choses in action, causes of

action, rights such as copyrights, trade-marks, patents, and processes, contingent interests and future interests, whether or not transferrable by the debtor." Id. pp. 175–176, U.S. Code Cong. & Admin.News 1978, p. 6136.

**10.** 11 U.S.C. § 101(14)(21); § 525.

**11.** "The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that. . . . The scope of this paragraph is broad. All proceedings are stayed. . . ." H.R.Rep.No. 95–595, supra, 340–342, U.S.Code Cong. & Admin.News 1978, p. 6297.

**11a.** GNMA also knew or should have known of the courts' rulings concerning a provision of the prior Bankruptcy Act (i. e. Section 517) which accorded an exemption from the provisions of Chapter XII to a mortgage insured pursuant to the National Housing Act. The decisions held that exemption was substantive and that the automatic stay of the Bankruptcy Rules, nevertheless, applied to stay the actions of any agency under that Act to recover property from the debtor outside the Bankruptcy Court. *In re Consolidated Motor Inns*, 1 BCD 1191 (N.D.Ga.1975); *In re Hall Associates*, 2 BCD 432 (E.D.Pa.1976); *In re Carousel Limited*, 3 BCD 737 (N.D.Ga.1977).

Section 306(g) of the Housing Act for GNMA. To have done so would have been unique and contrary to fundamental policy of the Bankruptcy Reform Act of 1978.

This holding is entirely consistent with the order of this court dated August 14, 1980, which held that the stay was applicable to GNMA and the 11 U.S.C. § 541 property in the possession of the debtor. This holding is also entirely consistent with the order of this court dated August 15, 1980, which agreed with the arguments of GNMA and FNBA and held that the stay must be lifted to permit GNMA to exercise its Section 306(g) rights in the issuer's agreement. No substantive rights of GNMA in the guaranty agreement were precluded or limited by the automatic stay applicable to Section 306(g) as it read prior to the October 8, 1980 amendment, or afterwards.

The language of the October 8, 1980, amendment to Section 306(g) arguably may be a more forceful statement of the protected substantive rights of GNMA in the issuer's agreement, but it falls short of providing an exemption to the Bankruptcy Code and the 11 U.S.C. § 362(a) stay.

Congress could have provided an express exemption from the stay, although it failed to exempt any other entity. Instead Congress rejected the apparently persistent pleas of GNMA to do so. GNMA, as this court previously observed (order of August 14, 1980, pp. 31–32), has long monitored the actions of the subcommittees which considered the Bankruptcy Reform Act of 1978 and was therefore familiar with the virtually all-encompassing scope of the stay. GNMA attempted to effect changes in the Reform Act while it was under consideration in order to effect the exemption for which GNMA argued before this court.[12] GNMA submitted proposals of statements for the congressional reports[13] to the subcommittee which was considering the Reform Act as seems probable from the portion of the House Report quoted above, supra note 2.

In August 1980, the proposed May 25, 1980 amendments to Section 306(g) and 307(b) in the Committee Bill S. 2752 came to the attention of the Chairman of the Subcommittee on Civil and Constitutional Rights of the House Judiciary Committee, Representative Don Edwards. The Judiciary Committee members were concerned that Section 307(b) would fly "in the face of what is standard and generally accepted procedure in the event of the filing of a petition in bankruptcy."[14]

---

**12.** Senate Hearings on S. 2266 and H.R. 8200 at 1133, 1150; 1160–1161. 95th Cong., 1st Sess. (1977). See fns. 26, 28, 30, 31, 32 in order of this court in the contempt proceeding, dated August 14, 1980.

**13.** *Id.*

**14.** Statement of Congressman Don Edwards, 126 Cong.Rec.H. 7377 (daily ed. August 21, 1980). The statement (H7377–7378) continued:

Mr. EDWARDS of California. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. Edwards of California: On page 70, strike out line 9 and all that follows through line 21.

Mr. EDWARDS of California asked and was given permission to revise and extend his remarks.)

Mr. EDWARDS of California. Mr. Chairman, the amendment I offer is to strike subsection (307(b)) page 70 so as to continue in

effect policies Congress adopted in the enactment of the Bankruptcy Reform Act of 1978. Since nothing has happened since that time to justify changing the policies, it is appropriate to eliminate section 307(b) since it would make such a change.

The purpose of section 307(b) is to give to the Secretary of the Department of Housing and Urban Development the power to foreclose a mortgage that is federally insured or guaranteed if the mortgagor has defaulted and then subsequently becomes a debtor in bankruptcy. This power to foreclose under such circumstances may sound perfectly reasonable, but *it flies in the face of what is standard and generally accepted procedure in the event of the filing of a petition in bankruptcy.*

*When a bankruptcy petition is filed, an automatic stay is triggered. That is, a kind of injunction. All actions which would affect the financial affairs and property of the debtor are stopped. Creditors may not take any action that would diminish the value of the*

The position of the Judiciary Committee regarding the conflict of Section 307(b) with the "standard and accepted procedure" of a bankruptcy case prevailed. On the other hand, the Judiciary Committee apparently did not view the proposed amendments to Section 306(g) in Section 335 of the Housing Act of 1980 as affecting in any way the jurisdiction of the Bankruptcy Court or the applicability of the stay to GNMA and its guaranty contracts. If the Judiciary Committee had had any fear that the argument made here by GNMA was possible, it seems reasonable that Congressman Edwards would have opposed the amendment to Section 306(g) for the same reasons he opposed Section 307(b).

The lobbying results favorable to GNMA regarding the amended language of Section 306(g) were included in its brief of October 31, 1980, but no reference was made to this court of the unsuccessful lobby efforts in regard to Section 307(b) of the Housing Act.

By order of this court dated May 1, 1980, the servicing portfolio of the GNMA guaranteed mortgage loans of the debtor may be sold with court approval. The proceeds of sale are to be paid into the estate.

By order of this court of August 15, 1980, incident to the adversary proceeding of GNMA for relief from the Chapter 11 stay, *GNMA was allowed to sell* the servicing portfolio of the debtor.

■ As observed in footnote 1, this court deferred a ruling on the possibility of sanctions against GNMA for contempt found by this court in its order of August 14, 1980 in the hope that subsequent actions of GNMA during the course of the Chapter 11 case might indicate the good faith of GNMA in its actions of February 7 and March 3, 1980, and perhaps purge the contempt found by the court. The court views the subsequent heavy-handed attitude and actions of GNMA as demonstrating further its arrogance toward the applicable bankruptcy

*debtor's bankruptcy estate.* There are several exceptions to this, *but these are not relevant.*

The automatic stay protects the estate so that the largest amount of property is available to satisfy creditors' claims, if it is a liquidation proceeding. On the other hand, if it is a reorganization proceeding, the automatic stay prevents creditors from removing from the estate property the debtor will need to accomplish whatever reorganization is proposed. If the Secretary of HUD has the power to foreclose, this will remove from the debtor's estate a most important asset. Not only would this prevent the debtor from being able to reorganize, but materialmen who have provided either labor or materials and who must look to satisfying their liens from that property would be precluded from that.

Nothing since the enactment of the Bankruptcy Code has happened to justify section 307(b). HUD's responsibilities under the National Housing Act have not in any way been adversely affected by the Bankruptcy Code as it presently is written. *The code is carefully crafted to balance the interests of debtors and creditors. No other creditor has an advantage such as HUD would have if section 307(b) is adopted.* Not only would this be an advantage, *it would be a preference,* and *this is quite contrary to Congress intentions in the code.*

Mr. Chairman, I understand that the reason for the subcommittee's proposing of section 307(b) is to assure that bankruptcy is not a guise in which a mortgagor-contractor will be able to evade his responsibilities under the National Housing Act.

Now, I am not going to say that such a thing could not happen. However, I am going to assure my friend, the gentleman from Ohio, that that is most unlikely.

First, we need not concern ourselves with a liquidation proceeding since HUD will be able to recover the property to the extent of its claim. Second, in a reorganization, the debtor and his creditors do not develop a reorganization plan through collusion and conspiracy; this is an arm's length bargaining and negotiating process. The reorganization plan represents what the parties see as that which is in each of their respective best interests. This means, among other things, that keeping the business going with little or no shift in business objective is the most desirable thing. This is so because any such shifts usually entail getting the creditors to put up more money or getting new creditors to put up additional capital, which is difficult; or, taking time to make the necessary adjustments, which means continuing to lose money.

More important than these reasons, (emphasis supplied)

laws, the debtor and creditors, and orders of this court.[14a] As discussed above, neither Section 306(g) as it existed in March 1980 nor the amendment to § 306(g) in Section 335 of the Housing and Community Development Act of 1980 exempts GNMA from the provisions of the Bankruptcy Code and the automatic stay as to property and debtors under the jurisdiction of this court. Yet GNMA argued this view again during May and June of 1981 in a misleading written brief and in oral argument in an attempt to legitimize its insistence that this court must approve a proposed nunc pro tunc order which GNMA had negotiated and effected in agreements with the debtor and FNBA. The agreement was effected by FNBA and the debtor as an inducement for GNMA's agreeing to sell the debtor's servicing portfolio pursuant to orders of this court dated May 1, 1980 and August 15, 1980. Without such concessions from the debtor and FNBA and the rubber-stamp approval of this court, GNMA threatens to sell the portfolio only at its own convenience. A sale of this debtor's primary asset (as provided by this court's order of May 1, 1980) is agreed by everyone concerned with this case to be in the best interests of the debtor and the creditors. Certainly this is true so long as GNMA continues to refuse to enter into a new issuer's agreement with Adana Mortgage Co., which is purely at GNMA's option. Thus, in the opinion of GNMA, it controls the progress and future of this Chapter 11 case; and neither the debtor, FNBA, other creditors, nor this court can do anything about it in the absence of GNMA approval.

This is a manifestation of the same deliberate, callused disregard of the debtor's and creditors' Chapter 11 rights and the jurisdiction and stay of this court as was exhibited in its unilateral, self-help actions of February 7, 1980 and March 3, 1980 to terminate the issuer's agreement and seize property under the jurisdiction of this court in violation of the stay.

Although allowed to do so since May 1, 1980, no application to sell the servicing portfolio was made by GNMA until May 11,

---

**14a.** 126 Cong.Rec.H. 7377 (daily ed. August 21, 1980).

Currently, Freddie Mac is providing a secondary mortgage market to State chartered S. & L.'s in States that prohibit due-on-sale clauses. Minnesota enacted legislation which prohibited due-on-sale clauses when: First, the assumption was to be undertaken by a person who meets the standards of creditworthiness normally used by persons in the leveling business; and second, or when the original homeowner remains liable for the full value of the mortgage.

Assumptions have been a common method of home purchase in my State and in much of the Midwest. Ever since its creation, Freddie Mac has purchased mortgages originated in Minnesota. However, when this practice was codified by the legislature, Freddie Mac notified the State that they would not purchase from savings and loans chartered in Minnesota. Minnesota has one of the lowest default rates of any State in the Nation. This common practice has not led to problems with the security of participation certificates in the past. Nor has Freddie Mac demonstrated that it will lead to any problems in the future.

*I view the action of Freddie Mac to be heavyhanded* and one which was taken without proving a need for this restriction. In this time of high interest rates, I think we will see use of this method of home purchasing increase by creditworthy buyers. However, should the assumption face unanticipated financial difficulties in the future, the mortgage and the value of Freddie Mac's mortgage pool is still secured by the value of the property.

Mr. Chairman, I urge your acceptance of my amendment.

Mr. STANTON. Mr. Chairman, will the gentlemen yield?

Mr. VENTO. I yield to the gentleman from Ohio.

Mr. STANTON. Mr. Chairman, I appreciate the gentleman's yielding.

The gentleman from Minnesota (Mr. Vento) is correct. We have looked at his amendment. We do have a considerable number of questions that I am not going to bother to bring up tonight, but I would hope that the gentleman would work with us after accepting this amendment.

I do not think we could go any further. This is an immediate problem, and if the amendment is accepted, before we get to conference I am sure we could get together on this. (emphasis supplied)

1981. On May 11, 1981, a joint application to sell the servicing portfolio was made accompanied by a proposed consent (by debtor, GNMA and FNBA) order of this court.[15] Representations were made to the court by movants upon presentation of the application and agreed suggested nunc pro tunc order that time for approval of an order was of the essence and that the time for responses to the notice of proposed sale should be shortened to allow completion of the sale during the month of May. Thus, the notice required parties of interest to affirmatively request a hearing within the ten day period of objections were desired to be made. On May 21, 1981, a hearing was held to hear objections made by two unsecured creditors. Notice was given to the debtor, FNBA and GNMA, and attorneys representing each attended. The objecting creditors pointed out that paragraph (d) of the application provided that the debtor shall pay $32,500 to GNMA as reimbursement of expenses incident to the sale of the servicing portfolio. But creditors informed further that some of said sum was to reimburse GNMA for legal and other expenses incident to the contempt proceeding wherein the court had found GNMA in contempt of the Chapter 11 stay. This allegation was admitted by attorneys for FNBA and the debtor, who argued for court approval of the agreed order, and argued that not all of the $32,500.00 was for reimbursement of expenses incurred by GNMA in the contempt proceeding, that some was for expense of GNMA in conducting the sale of the servicing portfolio in accordance with its sales procedures. While averring that during negotiations of the agreement to sell the portfolio they opposed the payment of any expenses to GNMA connected with the contempt proceeding, FNBA and debtor's attorneys argued that the agreement and order included some conditions favorable to the debtor and that an early sale was absolutely necessary for the best interests of the estate and unsecured creditors. The attorneys for the debtor and FNBA urged the

court to approve the proposed court order, without any change by the court. When the court expressed opposition to the withdrawal and cancellation of the August 14, 1980, contempt order as provided in the last paragraph of the proposed order as well as the provision requiring payment by debtor of some of GNMA's expenses connected with the contempt proceeding, the attorneys for FNBA, debtor and GNMA argued that the proposed order was a negotiated, agreed-to order and *any* change made by the court in the paragraphs opposed by the court would be objectionable to GNMA. That is, under the agreement struck by the parties, if the court altered any part of the proposed consent order, the agreement was off as to GNMA. The court countered that the court would approve the application to sell absent (1) the provision which vacates all prior orders of the court in this case, and (2) the provision for payment by debtor of any of the contempt proceeding expenses of GNMA. Attorneys for FNBA and debtor and GNMA argued vigorously that if such provisions of the agreed order were stricken by the court, GNMA would not agree to the order and would not sell the servicing portfolio unless the court included a specific order to GNMA to sell the portfolio in the time frame previously agreed upon. Reluctantly, the court included in the order a direction to GNMA to sell the servicing portfolio promptly in accordance with GNMA policy and procedures of sale as may be also in the best interests of the estate.

After the order of May 21, 1981, Washington attorneys of GNMA requested another hearing to hear its motion for reconsideration. At the hearing on the motion for reconsideration on May 29, 1981, GNMA stated it would not conduct the sale as ordered without the provisions negotiated with the debtor and FNBA which the court found objectionable. GNMA informed the court that alternatively, it would file an appeal, which would delay the possible reorganization of the debtor. GNMA argued

15. Application for consent order nunc pro tunc filed May 11, 1981.

that the appeal would be unopposed because FNBA and the debtor had joined in the GNMA motion for reconsideration; and thus the appeal would enjoy a high degree of likelihood of reversal. Because FNBA and the debtor supported the GNMA motion, the court on June 2, 1981, entered an order which vacated the order of May 21, 1981.

During the final typing of these findings, on June 4, 1981, the court was delivered a document entitled "Debtor's Second Application for Order Allowing Transfer of Property of Debtor and Settlement of Disputes Between Debtor and the Government National Mortgage Association," filed June 3, 1981. Attached thereto is a "Consent Order" agreed upon by GNMA and the debtor and a request for a hearing on June 8, 1981 at 2:30 p.m. for the court to determine whether to grant said application.

It is noted that there is no reference in this second application and second proposed consent order for any reimbursement by the debtor of GNMA expenses in connection with the contempt order of August 14, 1980. It does provide for the sale of the mortgage servicing portfolio of the debtor and sets out the procedures of sale. It is noted that the application, as before, is conditioned upon the court adopting the proposed consent order without change. It is noted that the consent order again proposes that this court shall vacate its order of August 14, 1980 (the contempt order). (See subparagraph (b) of proposed consent order filed June 3, 1980.) Again, in the view of this court, this demand of GNMA to vacate orders of this court seems an improper demand and condition of negotiation of GNMA and again illustrates its persistent and dictatorial attempts to ignore and disregard the jurisdiction and stay of the Bankruptcy Code.

## SANCTIONS

The argument of GNMA is that the issues considered in the contempt action, *viz.* the proper procedure of the termination of the debtor's status as an issuer, the rights to the mortgages and accounts, the power of GNMA to enforce its contracts and regulations, the scope of the automatic stay, the nature of the property interest—were ones that inevitably had to be addressed in the adversary proceeding of GNMA seeking relief from the stay, but for the contempt action brought by debtor, and thus such expenses of debtor are not properly attributable to the contempt proceeding. GNMA reasons that the costs of the contempt action were unnecessary because such issues were subsequently a part of the adversary proceeding brought by GNMA for relief from the stay. First, the defensive action of the debtor and its custodian banks would have been unnecessary but for the unilateral actions of GNMA in violation of the Chapter 11 stay and the required Bankruptcy Code procedures. Second, the time applied by both GNMA and the debtor to the adversary proceeding was appreciably less because of the immediately preceding contempt proceeding which covered many of the same issues.

The GNMA statute and the mortgage-backed securities guaranty program were brilliantly conceived and formulated. The congressional grant of power to GNMA was great—but not absolute—and seemingly not as great as desired by the guardians of GNMA. The truism of Lord Acton seems appropriate.[16] Apparently some officials at GNMA disliked the jurisdiction and stay

16. "Power corrupts; absolute power corrupts absolutely." Lord Acton. "Power will intoxicate the best hearts, as wine the strongest heads. No man is wise enough, nor good enough, to be trusted with unlimited power." Colton.

Thus, Congress has uniformly withheld the power to parties of interest under Title 11 U.S.C. to determine unilaterally whether it is subject to the jurisdiction and stay of the court. The Congressional policy is that Title 11 U.S.C. coverage is universal, and the Bankruptcy Court upon a proper application and evidence may grant relief.

provisions of the Bankruptcy Reform Act. From 1975 through 1978, GNMA sought legislation which would exempt it from the jurisdiction of the Bankruptcy Court and the stay provision of the Bankruptcy Code. Congress declined to provide for such a unique exemption.[17] In February-March of 1980, GNMA apparently decided to test the jurisdiction of the Bankruptcy Court and the stay over GNMA in this Chapter 11 case. Admittedly recognizing the risks of contempt, GNMA officials decided that the chance to demonstrate absolute power over the guaranty agreement was worth the risk. The risk-takers lost in this court. GNMA, during the contempt proceeding and after the special stay of this court in March, 1980, once again sought additional power by a grant from Congress through the Banking Committee and the Housing Act of 1980 rather than through the Judiciary Committee. Then GNMA decided not to sell the debtor's mortgages servicing portfolio, following permission to do so granted by order of this court dated May 1, 1980, but instead proceeded to pressure and persuade the parties to this Chapter 11 case to effect an agreement to cancel all negative orders of this court and eliminate negative legal precedents of this court and thereby acquire by default some of the desired absolute power. The considerable disparity of negotiating resources and powers between GNMA and the debtor and creditors is obvious.

The conclusion is inescapable to this court that the managing officials of GNMA are deliberately contemptuous of the automatic stay of the Bankruptcy Code, the rights of Chapter 11 debtors, the rights of GNMA issuers under the jurisdiction of the Bankruptcy Court, the rights of creditors and other parties of interest under the jurisdiction of the Bankruptcy Court, and the order of this Bankruptcy Court in this case. The officials of GNMA continue to refuse to sell the principal asset of the debtor without requiring commercially unreasonable and unwarranted concessions from the debtor, FNMA and this court. Thus, the contempts found by this court in its order of August 14, 1980 are not of a technical and excusable nature. They are not violations of reasonably prudent and conscientious parties based upon reasonable construction of applicable law.

Thus, sanctions should and must be imposed against the violators of the stay of this court.

At the hearing on November 13, 1980, amid the arguments and showings of the parties of interest, the debtor filed an affidavit as to applicable legal expenses incurred in the defense of the actions of GNMA of February 7, 1980 and March 3, 1980 and the bringing of the Motion for Contempt. The affidavit showed expenses for itemized legal services totalling $8,257.-50.

The court deems the award of damages to the debtor for its reasonable legal expenses incurred in this contempt proceeding to be the appropriate measure of damages in this case to be assessed against the contemptor, GNMA.[18] The court has reviewed the application of the debtor and awards the amount of $8,257.50 as damages of the debtor caused by GNMA in this contempt proceeding.

The First National Bank of Atlanta, (FNMA) filed an application for damages in the amount of attorneys fees rendered for First National in the defense of the action of GNMA of March 3, 1980 and in connection with the contempt proceeding in this court. Although FNBA filed a short memorandum in support of GNMA's position

---

17. Senate Hearings on S. 2266 and H.R. 8200 at 1133, 1150, 1160–1161; 124 Cong.Rec.S. 17403–34 (daily ed. October 6, 1978), S. 17409–17410. See fns. 26, 28, 30, 31, 32 in order of this court in the contempt proceeding, dated August 14, 1980.

18. *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47 (2d Cir. 1976, *cert. denied*, 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977).

that sanctions were not applicable, this court has rejected such position and finds FNBA is entitled to compensation for damages. The itemized legal expenses demonstrated by FNMA is deemed by this court to be the appropriate measure of damages of FNMA caused by GNMA to said creditor in this contempt proceeding. Thus, the court awards to FNBA the amount of $15,230.00 as damages caused by GNMA against the creditor incident to this contempt.

These damages fail to include possible damages to debtor and FNBA and perhaps others resulting from the delays in the progress of this case since August 15, 1980, caused by the unreasonable and unwarranted insistence of GNMA to exact advantages sought by it incident to the sale of the debtor's mortgage servicing portfolio.

These two sets of damages shall be paid by Government National Mortgage Association, as contemptor in this case. No award of damages is made at this time against the individual contemptors found in contempt by this court in the order of August 14, 1980. However, this is not to exonerate these individual contemptors from contempts found in this case. The actions of contempt during this case obviously were initiated and carried out by these individuals and perhaps others. It seems sufficient at this time to enter an order imposing the above-described sanctions against the corporate entity of Government National Mortgage Association and to forego at this point in this Chapter 11 reorganization case any possible sanctions against these individual contemptors.