In re Stephen Curtis LOWRY and Kathleen Margaret Lowry, Debtors.

Stephen Curtis LOWRY and Kathleen Margaret Lowry, Plaintiffs,

v.

MC NEIL CORPORATION, Defendant.

Bankruptcy No. 81–02912(1).
Adv. No. 82–0098(1).

United States Bankruptcy Court,
E.D. Missouri, E.D.

Sept. 16, 1982.

---

Arnold T. Phillips, Jr., St. Louis, Mo., for plaintiffs.

Harvey Tessler, Clayton, Mo., for defendant.

## MEMORANDUM OPINION

ROBERT E. BRAUER, Bankruptcy Judge.

On February 6, 1982, the Debtors, Stephen Curtis Lowry and Kathleen Margaret Lowry, filed a Complaint To Enforce the Automatic Stay against the above named Defendant, alleged to be their landlord. An Answer was filed on March 18, 1982, and trial was had on April 7, 1982, with ruling reserved.

I find the facts to be as follows: Prior to the filing of their Petition in Bankruptcy, the Debtors resided at 3660–9 Imperial Garden Drive, St. Ann, Missouri, in an apartment owned by the Defendant and leased to the Debtors. The Debtors made no rental payments during the months of September, October, and November, 1981. On November 27, 1981, the Debtors were served by the Sheriff of St. Louis County with a Landlord Summons Returnable December 17, 1981, at 9:30 a.m. in Division 33 of the Associate Circuit Court, St. Louis County, Missouri. The Debtors failed to appear in Court on December 17, and a default judgment was entered in favor of The Robert A. McNeil Corp.[1] and against the Debtors for unpaid rents, costs of court, and possession of the premises at 3660–9 Imperial Garden Drive, St. Ann, Missouri. The Debtors' Joint Petition under Chapter 13 of the Bankruptcy Code was filed at 4:03 p.m. on that same date, December 17, 1981. On December 29, 1981, the Defendant caused a Landlord execution to be issued to the Sheriff of St. Louis County, Missouri. The Sheriff evicted Debtors from the rental premises and removed the Debtors' personal property from their apartment to the adjacent sidewalk on January 14, 1982.

The Defendant's attorney was initially notified of the Debtors' bankruptcy by a letter from Debtors' attorney dated December 21, 1981 (Plaintiff's Exhibit 2.)[2] The Defendant was again informed of the Debtors' bankruptcy on January 14, 1982, the date of eviction, in a series of phone calls and conversations between the parties and between their respective attorneys. The Defendant refused all requests to return the Debtors' personal property to their apartment, although the Defendant ultimately agreed to store the Debtors' property in a vacant apartment at an unspecified location.

Mr. Lowry, a truck driver, was in the state of New Mexico on the date of the eviction. However, he learned of the eviction, before Mrs. Lowry did, by means of a phone call received from his supervisor at work. Mr. Lowry immediately telephoned the Defendant's apartment manager and

---

1. Note that this Complaint names Mc Neil Corporation as the Defendant. Defendant's Answer does not put into issue whether the Defendant, as named, is the appropriate entity against which a claim may be asserted. As a matter of pleading, the Defendant, as named, admits it was the landlord of the Debtors and procured the Debtors eviction from the rented premises.

2. This letter requested the release by Defendant of a garnishment running against Mr. Lowry's wages to satisfy an earlier judgment taken against the Debtors in a separate proceeding relating to another rental property. There was some uncertainty as to whether Defendant's attorney associated this letter regarding the garnishment with the suit for rent and possession of the Debtors' then current residence. Nevertheless, Defendant's attorney, to whom the letter is addressed, is the attorney of record for the Defendant in the eviction proceeding. (Plaintiff's Exhibit 1).

then the Debtors' attorney. The evidence does not reveal how Mr. Lowry's supervisor learned of the Debtors' eviction nor does it reveal whether Mr. Lowry learned of the eviction before or after the Debtors' possessions were removed to the sidewalk. The evidence does not identify the exact time of the eviction. Thus, it is not possible to determine from the evidence whether the Defendant was notified of the Debtors' bankruptcy on the date of eviction prior to the removal of the Debtors' property or subsequent thereto. However, a determination as to the precise time Defendant learned of the Debtors' Bankruptcy on the day of eviction is not necessary to and will not affect a ruling under the facts of this case.

Mrs. Lowry attended school on the date of the eviction and first learned of the eviction when she arrived home from school at approximately 3:50 in the afternoon. Her family's possessions had been placed on the sidewalk, and the apartment manager and a maintenance man were standing on the curb. Mrs. Lowry spoke with the apartment manager and the maintenance man. She was unable to contact the Debtors' attorney, but did reach Mr. Lowry who told her that he had contacted their attorney.

Mrs. Lowry testified that cars were lined up and down her street where usually cars are not parked and that people were helping themselves to the Debtors' possessions. Mrs. Lowry witnessed three couples and one single man taking, from the sidewalk, items of property that belonged to the Debtors. A neighbor saw the Debtors' television set taken and placed in one of the cars stopped on the street. When Mrs. Lowry was able to inventory the Debtors' personal possessions, she found an estimated $1100 to $1500 worth of items missing.[3] Mrs. Lowry

testified in detail regarding the expenses incurred by the Debtors in having to live in motels ($1573.74) and eat in restaurants ($1600), while looking for another apartment.

It should be noted at the outset that the Debtors' and the Defendant had a signed lease, and, under Missouri law, this lease was in effect on the date and at the time the Debtors' Joint Chapter 13 Petition was filed. Under Missouri Revised Statutes § 535.170, a lease is not discharged until after the execution of a judgment for rent and possession. Therefore the Debtors had not only a possessory interest in the apartment but a leasehold interest as well at the time of the filing of the Chapter 13 Petition.[4]

This leasehold interest and possessory interest of the Debtors became part of the Debtors' bankruptcy estate upon the filing of their Chapter 13 Petition. 11 U.S.C. § 541(a)(1) provides, with certain limited exceptions not applicable here, that all legal or equitable interests of the Debtor in property as of the commencement of the case become part of the bankruptcy estate. *Pickus v. Vigaliano (In re Pickus)*, 7 B.C.D. 189, 8 B.R. 114 (Bkrtcy.D.Conn.1980); H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 367 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 82 (1978), U.S.Code Cong. & Admin. News, p. 5787.

The Automatic Stay, referred to in the title of the Complaint, refers to the provisions of 11 U.S.C. 362(a), the language of which indicates clearly that the automatic stay provided for by it goes into effect the moment a bankruptcy petition is filed. The actions of the Defendant fall squarely within the prohibitions of at least three subsections of 11 U.S.C. § 362(a) including:

---

**3.** Mrs. Lowry testified that the following items were missing subsequent to the eviction: an RCA XL–100 color television set, a CB radio, a Bell & Howell movie camera and projector, a green tackle box and fishing equipment, a G.E. clock-radio, a Polaroid one-step camera, a green desk telephone, most of Mrs. Lowry's clothing including two nurse's uniforms, two dresses, an unspecified number of skirts,

slacks, sweaters, shirts, shoes, and sandals, a cowboy hat, and miscellaneous boxes kept in their apartment storage shed, the contents of which Mrs. Lowry did not remember.

**4.** I expressly reserve judgment on the effect of an intervening bankruptcy on the finality of a judgment rendered just prior (within ten days) to the filing of a Petition in Bankruptcy.

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate.

Certainly a suit for rent and possession is a judicial proceeding against the Debtor within the purview of § 362(a)(1). The issuance of a Landlord Execution is the enforcement, against the Debtor, of a judgment obtained before the commencement of the bankruptcy case within the scope of § 362(a)(2). The eviction of the Debtors from their apartment is an act to take possession of property of the estate, that is, to take possession of the Debtors' possessory and leasehold interest in the apartment, prohibited by § 362(a)(3).

Not only does the statutory language encompass the actions of the landlord Defendant, but any remaining question or doubt as to the impropriety of the Defendant's conduct has been dispelled by numerous court decisions proscribing this type of creditor action. These decisions have upheld the rights of Debtors in the face of creditor violation of the automatic stay.

In *Butler v. Bellwest Management Corp. (In Re Butler)*, 14 B.R. 532 (D.C.S.D.N.Y. 1981), the Bankruptcy Court denied a Chapter 13 Debtor's request for injunctive relief against the lessor of the Debtor's personal residence who had instituted eviction pro-

ceedings against the Debtor. On appeal, the District Court reversed and remanded holding

that if a wage-earner has a valid operative lease with a landlord of residential premises at the time of filing under Chapter 13, the automatic stay provisions of 11 U.S.C. § 362 apply to prevent the issuance of account of unpaid pre-petition rent of a state court warrant of eviction. So long as the stay remains in effect, there may be no eviction for unpaid pre-petition rent, without leave of the Bankruptcy Court obtained pursuant to § 362(b). 14 B.R. at 535.

The District Court directed that an injunction against any eviction of the Debtor remain in effect so long as current rent was timely paid and pending adjudication in the Bankruptcy Court of the validity of the Debtor's offer to assume the residential lease, an executory contract, and to promptly cure the Debtor's default by paying the rent arrears pursuant to 11 U.S.C. § 365(b)(1)(A).[5]

In *Fields v. Lewis (In re Lewis)*, 15 B.R. 643, 8 B.C.D. 528 (Bkrtcy.E.D.Pa.1981), the Court stated:

The issue presented herein is whether the automatic stay provisions of § 362(a) of the Bankruptcy Code ("the Code") apply to prevent a landlord from continuing with eviction proceedings against a debtor who remains in possession of premises where the landlord asserts (but the debtor denies) that the lease for those premises terminated before the debtor filed her petition for relief under the Code. We conclude that the automatic stay provisions do apply in such a situation to protect the debtor's right of possession, and therefore, the landlord must obtain a modification from the stay before he may continue with eviction proceedings. 15 B.R. 643, 8 B.C.D. at 529.

---

**5.** 11 U.S.C. § 365(a) provides, with certain exceptions not applicable herein, that the trustee, with the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365(b)(1)(A) provides as follows:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor,

the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(a) cures, or provides adequate assurance that the trustee will promptly cure, such default.

The Court concluded by stating that "even if the lease had been terminated, the automatic stay provisions of the Code restrain the landlord from taking any action to recover the leased premises" without leave by the Bankruptcy Court. *Id.* *See also: Gibbs v. Housing Authority of New Haven (In re Gibbs),* 9 B.R. 758, *modified,* 12 B.R. 737 (Bkrtcy.D.Conn.1981); *Endres v. Ford Motor Credit Company (In re Endres),* 12 B.R. 404 (Bkrtcy.E.D.Wis.1981); *In re Batla,* 12 B.R. 397 (Bkrtcy.N.D.Ga.1981); *Brooks v. Ford Motor Credit Company (In Re Brooks),* 12 B.R. 283 (Bkrtcy.W.D.Mo. 1981); *In re Eisenberg,* 7 B.R. 683 (Bkrtcy. E.D.N.Y.1980).

In *Miller v. Savings Bank of Baltimore (In re Miller),* 10 B.R. 778 (Bkrtcy.D.Md. 1981) the Court stated:

It is implied in § 362 that a creditor is under an obligation to maintain the status quo as of the moment of the filing of the petition and to take whatever affirmative action is necessary to do so.

An action taken in violation of the stay is void *ab initio* whether it is taken with knowledge of the stay or without. (cites omitted). A creditor who has taken such an action is therefore under an obligation to reverse it and to restore the status quo. The retention of an improved position gained by the creditor in violation of the stay is itself a continuing violation of the stay ... *Id.* at 780.

■ Thus, whether the Defendant knew of the Debtors' bankruptcy prior to the actual eviction is immaterial under the facts of this case. It is uncontroverted that the Defendant learned of the bankruptcy while the eviction was taking place or shortly thereafter. At that moment, if not earlier, the Defendant came under an obligation to reverse its actions and restore the status quo, *i.e.* put the Debtors back in possession of their apartment. The Defendant's refusal to restore possession of their apartment to the Debtors was a knowing and continuing violation of the automatic stay.

The foregoing cases uphold one of the fundamental debtor protections afforded by the Bankruptcy Code. In language found in the legislation history, the purpose behind the automatic stay is explained clearly.

It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 340–2 (1977); S.Rep. No. 95–989, 95th Cong.2d Sess. 49–51 (1978), U.S.Code Cong. & Admin.News, pp. 5835, 6296–97.

In a Chapter 13 case context, the automatic stay permits the Debtor (lessee) to attempt reorganization, and to assume the lease and cure the default (as pointed out, supra, p. 55). Defendant's eviction of the Debtors obviously interfered with the exercise by the Debtors of such rights granted to them by the Bankruptcy Code.

It is important to emphasize that the Defendant was not, under the facts of this case, without remedy. The Defendant could have filed a Complaint to terminate or modify the automatic stay to permit the continuation of the state court proceeding to secure an order of eviction. In the alternative, the Defendant could have requested adequate protection of its property interests in respect of the Debtors' continued use and occupancy of the rental premises.

■ The Debtors are entitled to compensation for damages suffered as direct result of the Defendant's knowing[6] violation of

---

6. Knowledge was imparted by the letter, dated December 21, 1981, from Debtors' attorney to

the automatic stay. *Brooks v. Ford Motor Credit Company (In re Brooks)*, 12 B.R. 283 (Bkrtcy.W.D.Mo.1981); *Miller v. Savings Bank of Baltimore (In re Miller)*, 10 B.R. 778 (Bkrtcy.D.Md.1981).

The measure of damages, to be awarded, is of difficulty. Mrs. Lowry testified that their property, stolen from the sidewalk, had a value between $1,100 and $1,500; that she and her family, subsequent to eviction, was forced to live with friends, and in various motels, their lodging expenses totaling $1,573.74 between the time of eviction and the time of trial, April 7; that $1,600 was spent for food in restaurants during that period.

Evidence was *not* adduced as to the reasonable food costs which Debtors and their family would have expended had they continued to live in the rented premises— where the rent was $275 a month.

Moreover, although *In re Butler,* supra, points out that a debtor may cure a lease default in a Chapter 13 proceeding, Debtors did not presume to attempt to cure the default here: as, their initial Chapter 13 plan, filed on January 10, 1982, prior to the eviction, did not contain any provision for cure; and an Amended Plan, filed April 13, 1982, subsequent to the eviction, did not contain any provision for cure.

Under these circumstances, Defendant could, by proper proceeding, have obtained a modification or termination of the 11 U.S.C. 362(a) stay within some early time subsequent to the filing of the Chapter 13 proceeding (December 17, 1981); or, at some early time subsequent to the filing of Debtor's Chapter 13 plan, on January 10, 1982, when it became apparent that Debtors did not intend to cure the lease default. Even though Defendant did not obtain a modification or termination of the 11 U.S.C. 362(a) stay, because of the circumstances here wherein Debtors did not, in their Chapter 13 plans, propose to cure their default, I do not believe Debtors are entitled to continuing damages beyond a time when

they could reasonably be deemed to have been required to vacate the rented premises, either by an eviction order obtained in the State Court subsequent to a termination of the stays by this Court, or by an order from this Court. I do not believe Debtors are entitled to damages, for increased food and rental costs, beyond March 15, 1982.

Upon Mrs. Lowry's testimony, Debtors expended $1,032.15 for lodging between the eviction and March 15, as compared to rent of $550 a month they would have been required to pay for the rent of the rental premises to that time. Debtors are entitled to damages, accordingly, of $482.15 for this increase in housing costs.

Mrs. Lowry testified, also, that an average of $20 a day was spent for food and restaurant expenses, which I find to be a minimal amount. They have two children, ages 5 and 10. Though evidence was not adduced as to the reasonable food costs, for a family of four, were they to have continued to live in the rented premises, it is my judgment, for damages purposes, such food costs would have been $600 for the period January 14 to March 15. Accordingly, Debtors are entitled to additional damages of $600 for their increased food costs attributable to the eviction.

Further, upon Mrs. Lowry's testimony, uncontradicted, Debtors are allowed $1,100 in damages for the theft and taking of their property from the curb site.

In the prayer of the Complaint, Debtors seek punitive damages, and attorneys fees. I do not propose to allow either. Debtors' attorney could have reasonably prevented all of this litigation, and Debtor's consequential damages from the eviction, in a number of ways, not the least of which was advice to Defendant's counsel, in the letter to him of December 21, 1981 (Pltff's Exh. 2), that further proceedings in respect of eviction, as well as the garnishment proceeding, were stayed.

Defendant's attorney (p. 53, supra), and again on the day of the eviction during the evic-

tion process (p. 53, supra).

Accordingly, upon the Complaint, a judgment is being entered, in Debtors Plaintiffs' favor, against the Defendant, in and for the sum of $2,182.00, plus costs.