In re CONTINENTAL MARINE
CORPORATION, Debtor.

CENTERRE BANK NATIONAL
ASSOCIATION, Plaintiff,

v.

CONTINENTAL MARINE
CORPORATION,
Defendant.

Bankruptcy No. 82–01018(1).
Adv. No. 82–0340(1).

United States Bankruptcy Court,
E.D. Missouri, E.D.

Jan. 5, 1984.

Gregory D. Willard, St. Louis, Mo., for Centerre Bank, applicant.

Alan J. Steinberg, Clayton, Mo., for debtor.

Vincent D. Vogler, Jr., William J. Prebil, St. Louis, Mo., for debtor and E. Thomas Drennan.

Stuart J. Radloff, St. Louis, Mo., Trustee.

## MEMORANDUM OPINION

ROBERT E. BRAUER, Bankruptcy Judge.

The Plaintiff Bank has filed a two-Count Application, seeking in each Count an adjudication in contempt against the Debtor, and other relief. Count II of the application is said to present the question: may a Debtor be adjudicated in contempt—absent an order by the Bankruptcy court—for a failure, whether willful or otherwise, to obey the commands of 11 U.S.C. § 363(c)(2), and (4), which *prohibits* the use of cash collateral[1], by a Chapter 11 Debtor[2], and *requires* the segregation and accounting of such cash collateral by such Debtor, *unless* each entity having an interest in such cash collateral consents to the use of such collateral or the Court after notice and hearing authorizes such use.

Without first describing the factual details of the case, I should like to answer the question said to be presented, with an emphatic "No".

Neither party has cited a case wherein any Court has determined that Debtor's failure to honor the statutory prohibitions and commands of 11 U.S.C. § 363(c)(2) and (4), absent a court order, constitutes a contempt punishable as such, and my research has disclosed none.

The Bank argues that a Debtor's willful failure to heed the *statutory* prohibitions and requirements of 11 U.S.C. § 363(c)(2) and (4) is as much a contempt, as one's failure to obey the *statutory* commands of the automatic stays of 11 U.S.C. § 362 has been held to constitute a contempt.[3]

■ A judicial contempt does not ordinarily flow from the violation of a *statute* to the injury or damage of another. Ordinarily it flows from the violation of or non-compliance with a *court order*. See *In re Revere Copper and Brass, Inc.*, 29 B.R. 584, 10 B.C.D. 722 (Bkrtcy.S.D.N.Y.1983). Violation of the *statutory* automatic stays is different—if it warrants a finding of contempt and the imposition of contempt penalties and sanctions—however, *because* the stay provisions of 11 U.S.C. § 362(a) have the effect of a (Bankruptcy) Court order and are designed to expedite automatically the stays *that otherwise would be obtained by a Bankruptcy Court order*. The transition of the stays, from injunctive orders entered in individual cases, to the Bankruptcy Rules, to the statutory provisions of 11 U.S.C. § 362(a), is traced by the treatise writers in 2 *Collier on Bankruptcy*, 15th

---

1. 11 U.S.C. § 363(a) defines "cash collateral" to mean "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest."

2. 11 U.S.C. § 363(c) relates the proscription to unauthorized use of cash collateral to a trustee. In re Chapter 11 case, as here, where a trustee is not appointed, the Debtor, as debtor in possession, has all of the powers of a trustee and is subject to his prescribed limitations.

3. This Court has held that a failure to heed the commands of the automatic stays of 11 U.S.C. § 362(a) may constitute a contempt. *In re Lowry*, 25 B.R. 52, 9 B.C.D. 1127 (Bkrtcy.E.D. Mo., 1982). Other Courts have so held, also. See *In re Voight*, 24 B.R. 983, 9 B.C.D. 1235, 1238 (Bkrtcy.N.D.Tex., 1982); *In re Pal Transport, Inc.*, 13 B.R. 935, 8 B.C.D. 183 (Bkrtcy.N. D.Fla., 1981): *In re Eisenberg*, 7 B.R. 683, 697, 691 (Bkrtcy.E.D.N.Y., 1980); *In re Miller*, 10 B.R. 778 (Bkrtcy.D.Md., 1981); *In re Brooks*, 12 B.R. 284 (Bkrtcy.W.D.Mo., 1981).

Ed., Sections 362.01–.03, pp. 362–5 to 362.27, and Section 362.11, pp. 362–58 to 362–60.

The statutory cash collateral provisions do *not* have such a genesis. And, I do not perceive that the protection afforded by those provisions to private security interests is as fundamentally necessary and important to the bankruptcy process as are the automatic stays and their enforcement by contempt remedies.[4]

■ The judicial contempt power is a potent weapon, to be used only where clearly warranted; the contempt power is a drastic remedy, and its use should be invoked only when the right of its use is clear. *Schleper v. Ford Motor Co. Automotive Division*, 585 F.2d 1367 (8 Cir., 1978); *In re Hailey*, 621 F.2d 169, 6 B.C.D. 878, 880 (5 Cir., 1980); *In re Pal Transport, Inc.*, supra (footnote 3).

■ I do not believe that the contempt remedy is available to enforce the Debtor's compliance with the cash collateral provisions of 11 U.S.C. § 363(c)(2) and (4), nor to punish the Debtor who has failed to comply with those provisions, absent first the entry of an appropriate injunctive (mandatorily injunctive, or prohibitorily injunctive) order which specifically requires, or forbids, a course of conduct bottomed upon those provisions.

. . . .

A request for other and further relief is made in Count II, also. This additional request, and the relief requested by Count I of the Application, are to be considered in this factual context: [5]

Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on April 28, 1982. On May 12, 1982, the Bank filed its Request For Adequate Protection/Complaint For Relief From Automatic Stay, requesting (a) an order requiring Debtor to comply with the cash collateral provisions of the Code; (b) an order providing the Bank with adequate protection, or in the alternative, terminating the automatic stays; and (c) for such other relief as is just and appropriate.

In the Request/Complaint, the Bank alleged that in November, 1976, Debtor executed a promissory note, payable to its order, in a sum in excess of $4 million; that the note is secured by a Fleet Mortgage, as supplemented, by which a security interest in 24 covered hopper river barges is created and granted; and that the note is further secured by a security interest, granted September 16, 1981, in accounts receivable; and that each of the security interests has been perfected as required by applicable law. Continuing, it is alleged that the receivables constitute cash collateral, and were being collected, expended and disposed of without the Bank's consent, and not pursuant to any Court order, violative of 11 U.S.C. § 363(c)(2); and that such receivables were not being segregated and accounted for as required by 11 U.S.C. § 363(c)(4).[6]

In paragraph 10 of the Request/Complaint, the Bank alleges that

> The rights conferred by the bankruptcy statute upon debtors and creditors would be virtually meaningless. Without the stay, the debtor and creditor would be confronted with a race to the courthouse, and the inequity of resisting actions of creditors having more powerful resources; indeed, the debtor and less powerful creditors would be virtually left with the law of the jungle."

4. In *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 1012, 7 B.C.D. 1098, 1101 (Bkrtcy.N.D.Ga., 1981), The Court says, speaking of the automatic stays
   "The general policy of the Bankruptcy Reform Act of 1978 is to initially effect universal jurisdiction and then allow the court to grant relief. The conclusion of the 95th Congress, the Bankruptcy Commission, and the Bankruptcy Rules is that the automatic stay is fundamental to the orderliness of a bankruptcy statute. It is coupled with the necessary pervasive jurisdiction, the pervasive definition of property of the debtor, and the pervasive coverage of entities including all levels of the Federal government. Without the automatic stay the statutory rights of debtors and creditors would be in disarray.

5. The facts, to be described, relate as well to *all* of the relief requested by Count II.

6. It might be noted, here, that even though Section 363(c) violations are alleged, a contempt was not specifically charged, and contempt relief was not specifically requested.

"the value of the Bank's security interest in the Debtor's property is in an amount greater than the amount of the Bank's claim herein" [7], so to permit the Bank to "accruing interest, fees, cost and charges" under 11 U.S.C. § 506(b).[8]

A Summons And Notice Of Trial was issued upon the Request/Complaint, fixing the trial for June 14, 1982, at 2:00 p.m.

On June 11, 1982, the parties filed a Consent Agreement which, in respects material to this controversy, was approved by this Court, by order entered, on June 14, 1982. The Agreement was to terminate not later than August 27, 1982, unless extended by the parties by an agreement approved by the Court.

By the Agreement, the Debtor admits to an indebtedness of $2,965,535.85 (Principal), and $41,146.81 (Interest), totaling $3,006,-682.66, due the Bank at the time of filing of its Chapter 11 petition (April 28, 1982), with interest of $1,523.96 accruing daily. Debtor also admitted, in the Consent Agreement, to owing Pott Industries (Pott), on April 28, 1982, $384,000 (Principal), and $14,330.64 (Interest), totalling $398,330.64, with interest at the rate of $94.68 accruing daily; that Pott had a subordinate security interest in the 24 barges and proceeds thereof; and that the Bank and Pott had, with the Debtor, entered into a certain Subordination Agreement, wherein the Bank and Pott shared pro rata in certain recoveries made by either in respect of the barges.

The parties reiterated the fact that the collateral had a value in excess of the Bank's (secured) claim *and* in excess of the Pott (secured claim).[9]

By the Agreement, Continental was to abide by an agreed-upon Plan of Operation through August 27, 1982, (the termination date).[10] In turn, Debtor was to be permitted to use the cash collateral "pursuant to and in conformity with its Plan of Operation". As a measure of adequate protection, the Bank was (a) permitted to set-off funds held in Debtor's pre-petition account at the Bank and apply the funds against its secured claim; and (b) Debtor was to pay the Bank $20,000, on June 15, 1982; $10,000, on July 15, 1982; $5,000, on August 15, 1982; and $5,000 on August 27, 1982, the Bank and Pott to share in the payments according to a formula.[11]

By the Agreement, the Debtor also committed itself to use its best efforts to sell its business, or its fleet, or portions thereof, by August 27, 1982, the termination date.

The agreement granted to the Bank a security interest in post-petition accounts receivables.

On September 8, 1982, upon advice from Bank's counsel that the parties' Agreement had not been consummated, an order was entered vacating the order (of approval of the Consent Agreement) of June 14, 1982, and setting the Cause for trial on September 23, 1982, at 10:00 a.m.

On September 13, 1982, the parties filed an Extension Of Consent Agreement, by which the terms of the Consent Agreement filed June 11, 1982, were extended to and including October 8, 1982, subject to the additional terms and conditions of the Extension Agreement.

---

**7.** This language tracks the language of 11 U.S.C. § 506(a), language employed by Congress to say that the value of the Bank's collateral exceeds the amount of its secured debt.

**8.** The amount of the secured debt due is nowhere alleged in the Request/Complaint. Nor is the value of the barges, nor the value of the receivables, anywhere stated.

**9.** The Consent Agreement does not tell us the value of the collateral.

**10.** Debtor was to promptly reduce its ongoing costs and expenses of operation, and was not to accept any new contracts without prior writ-

ten consent of the Bank. It was to make only those expenditures as are reasonable and necessary to its continued operations, including (but not limited to) rent, insurance premiums and payroll. All cash then in its possession or thereafter received was to be deposited in certain bank accounts in the Bank, and no other accounts were to be maintained.

**11.** The record made at the contempt hearing does not tell us (a) the amount of the deposit permitted to be set off, nor (b) whether any of the payments was made.

By the Extension Agreement, the salary and other compensation of E. Thomas Drennan, Sr., Debtor's President, was to be decreased by an amount equaling 20% of his present earnings [12]. And, Debtor's Assistant Secretary was to be permitted to resign, as of August 31, 1982, without any severance pay. Debtor was to make additional payments of $12,500, to the Bank, on September 15, and on October 8, 1982.

On October 21, 1982, the Bank filed a Motion For Segregation Of Cash Collateral in the Adversary Cause, alleging that Debtor has been collecting the Bank's cash collateral; that the Bank is unaware of the extent of the collections and the location of the deposit of the collected collateral, there thus being a risk of unauthorized expenditure of the collected cash collateral by the Debtor. Upon the Motion, an order was entered, on October 21, 1982, by Judge Barta of this Court, providing that

"1. All monies received by the Debtor now or hereafter from whatever source or sources shall be immediately deposited by the Debtor at the Debtor's previously established debtor-in-possession account at Centerre # 11–503–9.

"2. No monies shall be expended from said account except upon the prior written consent of Centerre or upon order of this Court after notice and hearing."

On December 3, 1982, the Application sub judice was filed by the Bank. In Count I thereof, the Bank requests that the Debtor be adjudged in contempt of the order of October 21, 1982, because of Debtor's asserted failure willfully to comply with the order "in that Debtor has a substantial amount of money held in an account other than in accordance with said order".

In Count II of the Application, the Bank charges that subsequent to October 8, 1982, Debtor received a cash payment in excess of $27,000; that the proceeds of the payment constituted the Bank's cash collateral; that a substantial part of the proceeds, in two payments, totaling approximately $9,000, was paid to Mr. E. Thomas Drennan, Sr., Debtor's president; and that these payments to Drennan directly contravene the prohibition of 11 U.S.C. § 363(c)(2). The Bank's prayer is that the Debtor be adjudged in contempt because of its violation and disregard of Section 363(c)(2) [13]; and that Mr. Drennan be ordered to return to the Debtor any and all monies improperly received by him, and that those returned monies be deposited in the Bank in accordance with the order of October 21, 1982; and for such other and further relief as is just and proper.

On October 11, or 12, 1982, Debtor received a check for $28,684.32, from Consolidated Grain & Barge Co., in payment of freight bills issued by Debtor for services rendered to Consolidated. The check was deposited into a dormant account, previously existing, maintained by the Debtor, in the First National Bank of Clayton. Debtor's President perceived no need to deposit the check into an account in the (Centerre) Bank because Debtor's agreement with the Bank terminated on October 8, 1982. The proceeds of the deposited check were used, to pay Kloecker Ins. Agency, $534; and Misco Fleet, Inc., $4,000 (in payment of a portion of a current bill). These payments have not been particularly assailed by the Bank (except as the Bank has argued that any disposition of the cash collateral, without its consent and not pursuant to court order, is improper and contumacious because of the attendant violation of Section 363(c)(2) and (4)).

A payment of $7,007.02, also, was made to Morrison Barge Co. Debtor's president, Drennan, testified that Debtor collected freight bills for Morrison and would forward the collections to Morrison; that he could not say when the $7,007.02 in previously-unremitted collections had been made; that it was possible the payment could have been made to remit collections made by the Debtor pre-petition; and that Debtor had completed some voyages after the chapter 11 petition had been filed, but didn't bill for any freight hauled after the Chapter 11 petition was filed.

---

**12.** His present earnings were not disclosed.

**13.** This request is being denied, for reasons given heretofore in this Opinion.

Other payments, from the proceeds of the Continental Grain check, were made to Drennan himself: two checks, each for $2,166.40, being take-home pay for pay periods 9/15 through 10/1, and 10/1 through 10/15; and a check for $4,848.00, in payment of unreimbursed travel expenses.

In respect of the pay checks: the amount of each is Drennan's reduced net salary, after having agreed, with the Bank, in the Extension Agreement, to take a 20% salary cut. Drennan did not discuss the propriety of these payments with any attorney; he assumed the payments were permissible as the payment of normal, operating expenses, even though these checks were paying him salary as for which he had earlier issued salary checks, to himself, drawn upon an operating account in the Bank, where the checks were returned by the Bank, to the Debtor, unpaid.

Concerning his travel expenses: Drennan testified that the expenses were incurred in his attempt to sell the barges; that the Bank was aware of his attempts to sell; that he viewed the expenses, and the reimbursement, as normal, in that the Bank had not ever remonstrated with him that he was to attempt to sell the barges on his own account, out of his personal pocket. He identified Exhibit A as being invoices, bills and statements of expenses incurred and paid in such effort.

Exhibit A adversely reflects upon Drennan's credibility, however; in that one item of reimburseable expense is $378, for Air Fare on 3/31, or 28 days prior to the Chapter 11. This expense is a pre-petition expense, for the payment of which there is absolutely no justification. Similarly, Exhibit A claims meals in St. Louis, in April, $156.89. American Express credit card charge slips in support thereof reflect charges of $31.47, on April 28, 1982, at the Tang Dynasty Restaurant, Chesterfield, MO. (this bill was hardly incurred in an effort to sell the barge fleet); of $9.75 at the Breckenridge, at St. Louis, on *4/27/82;* and of $88.95, on *4/20/82,* at the Coach

House, in Ballwin. These latter two are, most assuredly pre-petition expenses, for the payment of which there is no justification.

Even so, the payments to Drennan, whether authorized, or unauthorized, are not, for reasons given in the Bank's Application, contumacious: as, (1) they were made after the termination of the Extension Agreement, and prior to the entry of the October 21, 1982, order; and (2) if the payments constitute an improper and impermissible deviation of the Bank's cash collateral, as they do, they are not contumacious for that reason alone, as earlier ruled.

■ However, Drennan's admitted repayment, to himself, of the pre-petition expenses, *does violate the stays* of 11 U.S.C. § 362(a), and is absolutely contrary to all principles of bankruptcy administration. Nevertheless, he is not to be adjudged in contempt upon the pending Application, because it does not charge him with a Section 362(a) contempt; because the evidence does not show a clearly contumacious frame of mind (see *In re Revere Copper and Brass, Inc.,* supra); and because the Debtor, and the Bank, can be made whole, without compelling contempt sanctions, by an order requiring repayment of those reimbursed prepetition expenses to the Trustee.[14] See *In re Cudaback,* 22 B.R. 914, 9 B.C.D. 695 (Bkrtcy.D.Neb., 1982).

. . . .

At the time of the entry of the order of October 21, 1982, $7,962.40 remained on deposit in the Debtor's account in the First National Bank in Clayton. Subsequent to its receipt of a copy of the order of October 21, Debtor caused the transfer of the balance to a trust account maintained by its counsel, who apparently was making, at the time, some claim to compensation, to be paid out of that balance.

■ The transfer, to the trust account, is not actionable, in contempt, in my judg-

**14.** An order for relief under Chapter 7 was entered in this bankruptcy case on January 24, 1983. The order entered upon this Application is, of course, without prejudice to the Trustee's right of recovery, if any exists, against Brennan for those expenses, evidenced by Exhibit A, which may not be justified as "ordinary".

ment: because (1) the order of October 21 is not a model of clarity; contempt sanctions are to be imposed only where the order (disobeyed) is clear, and the violation is clearly and convincingly evident; (2) the Debtor, and the Trustee, and the Bank, can be made whole by an order requiring the transfer of the funds to the Trustee, and such an order is being entered; and (3) sanctions against this corporate Debtor are personally meaningless, and would accomplish nothing except a diminution of the estate otherwise available to creditors.[15]

I have recently held, in *Williams v. Ponder, et al.,* Adv. Cause 83–0405(1), in an Opinion filed on December 30, 1983, that whether this Court, not an Article III Court, has the power to enter a contempt judgment and impose contempt sanctions, is too close to call [upon the authority of *In re Cox Cotton Company, d/b/a James Grain & Cotton Co.,* 24 B.R. 930, 9 B.C.D. 1176 (D.C. E.D.Ark., 1982)], and held that the contempt cause (where it was my judgment that a contempt had been proved) should be transferred to the District Court for its determination, the transfer being accompanied by recommendations as to fact and as to decision. Even so, it is my judgment that this Court does have the power to determine whether or not a contempt cause should be transferred to the District Court (where it has originated in this Court), and the power to determine that it should not be transferred if, in its judgment, a contempt has not been proved.

It is my judgment, also, that this Court has the power, in the circumstances of this case, to order Mr. Drennan, and Mr. Steinberg, to pay to the Trustee the sums hereinbefore referred to, to restore to this bankruptcy estate something that is clearly property of the estate or its equivalent.

. . . .

Also heard, at the time the Application was heard, is the Bank's Motion For Order Designating Certain Facts as Established

And For Sanctions Pursuant To Bankruptcy Rule 737.

I do not see the need to expound upon its merits or demerits. In the circumstances of this case, the Motion is being denied.

---

**15.** This is *not* to say that Debtor's conduct, and its counsel's conduct, in respect of the transfer, is approved. Debtor's counsel, on and after October 21, had no greater claim to any of the deposit, whether for fees or otherwise, than Drennan had a claim thereto for the reimbursement of pre-petition expenses.