## In re A–1 SPECIALTY GASOLINES, INC., Debtor.

### Bankruptcy No. 99–33642–BKC–SHF.

United States Bankruptcy Court,
S.D. Florida,
West Palm Beach Division.

March 3, 2000.

Scott L. Baena, Stroock & Stroock & Lavan LLP, Miami, for SouthTrust Bank, N.A.

Denyse Heffner, A.U.S.T., Miami.

Marvin E. Kramer, Garden City, NY, pro se.

Kenneth B. Robinson, Rice & Robinson, P.A., Miami, for Trustee.

Kenneth S. Rappaport, Boca Raton, for Stanley and Walter Coven.

### ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CONTEMPT AND SETTING EVIDENTIARY HEARING

STEVEN H. FRIEDMAN, Bankruptcy Judge.

THIS MATTER came on for hearing on December 30, 1999, on the Motion by SouthTrust Bank, N.A. ("Creditor") for Civil Contempt and Sanctions. The Creditor seeks sanctions against Stanley Coven, Walter Coven, and Marvin Kramer for causing or allowing the Debtor to use the Creditor's cash collateral in contravention of the Bankruptcy Code and this Court's August 19, 1999 Order Granting the Emergency Motion by SouthTrust Bank, N.A. to Prohibit Debtor's Use of Cash Collateral or for Adequate Protection. The Court finds that the acts and omissions of Marvin Kramer do not rise to the level of contempt. The Court further finds that acts of Stanley Coven and Walter Coven do constitute civil contempt, warranting compensatory sanctions in favor of the Creditor. Because compensatory sanctions must be based upon evidence of the complainant's actual loss, the Court shall hold an additional evidentiary hearing to determine the precise extent of the Creditor's injury. *See United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

The Debtor filed a voluntary Chapter 11 petition on July 23, 1999, scheduling the Creditor as secured to the extent of $838,-672. Pursuant to two security agreements executed in February 1998, the Creditor held a security interest in the Debtor's inventory, accounts, instruments, documents, chattel paper, equipment, and other rights to payment, as well as the proceeds thereof. On August 3, 1999, the Creditor filed an Emergency Motion to Prohibit Debtor's Use of Cash Collateral or for Adequate Protection ("Motion to Prohibit"), alleging that the Debtor's post-petition use of cash collateral without consent or authorization violated 11 U.S.C. § 363(c)(2). At a hearing held on August

6, 1999, the Court granted the Motion to Prohibit and directed the Debtor to immediately cease its use of cash collateral. On August 19, 1999, the Court entered its Order Granting the Emergency Motion by SouthTrust Bank, N.A. to Prohibit Debtor's Use of Cash Collateral or for Adequate Protection ("Prohibition Order"), finding that the Debtor admitted to using cash collateral since the petition date, without consent or authorization, in direct contravention of Section 363(c)(2). The Prohibition Order enjoined the Debtor from further using cash collateral without the consent of the Creditor or further order of the Court. The Prohibition Order also directed the Debtor to file and serve a complete accounting of cash receipts and disbursements from the petition date, as well as a delineation of credit balances on all deposit accounts, by no later than August 13, 1999.

The Debtor did not file an accounting as ordered by the Court, and on August 20, 1999, the Creditor filed a Motion for Relief from the Automatic Stay. On September 1, 1999, the Court entered its Order Pursuant to Section 362(d) of the Bankruptcy Code Granting SouthTrust Bank, N.A. Relief From the Automatic Stay. On September 2, 1999, the Creditor retained BNC Asset Recovery and Management, Inc. ("BNC") to assist in marshaling the Creditor's collateral. Thereafter, BNC's representatives allegedly observed Walter Coven using the Creditor's cash collateral. On September 10, 1999, the Creditor corresponded with Mr. Kramer and Mr. Telepman, co-counsel for the Debtor, complaining of the alleged continued use of the cash collateral. On the same date, Mr. Kramer responded to the Creditor's letter, acknowledging that cash collateral was being used but arguing that the Creditor's complaints were "not appropriately taken" because "[e]very time inventory is withdrawn for delivery to the independent customer, [the Debtor] has an account receivable from the customer which more than adequately replaces the inventory in the asset calculation of the corporation." On

September 15, 1999, the Court entered an Order Converting Chapter 11 Case to Case Under Chapter 7.

At the hearing on the instant motion, Marvin Kramer testified that at the inception of this case, he knew the Creditor was secured, but did not know the exact nature of the collateral securing the Creditor's claim. Mr. Kramer further testified that though he was an expert in Chapter 11 motor fuel industry cases, the issue of cash collateral never entered his mind until the Creditor filed the August 3, 1999 Motion to Prohibit. Once he purportedly became aware of this issue, he immediately told Stanley Coven to stop using cash collateral. Mr. Kramer testified that if he didn't make this sufficiently clear to Stanley Coven on August 4, he definitely did on August 6. After the August 6 hearing on the Motion to Prohibit, Stanley Coven told Mr. Kramer the Debtor was out of business. The following week, Stanley Coven told Mr. Kramer that the Debtor had to "throw in the towel" (which Mr. Kramer understood to mean that the Debtor could no longer operate since it could not use cash collateral). According to Mr. Kramer, he spoke with Stanley Coven again on September 10 and asked him if the Debtor was still using cash collateral. Stanley Coven confessed that the Debtor was using cash collateral but tried to justify it by arguing that the Debtor was enhancing the Creditor's collateral. Mr. Kramer then immediately wrote the previously-mentioned letter to the Creditor, in which he informed the Creditor of the Debtor's use of cash collateral but contended that the Creditor's complaints were "not appropriately taken." Mr. Kramer testified that in the September 10 letter, he "embraced his clients' scenario" but never "countenanced their scenario." At the December 30, 1999 hearing, Mr. Kramer admitted that by the time he wrote this letter, he knew the use of the cash collateral was unlawful but was "trying to present the most favorable position for [his] client."

■ The Creditor contends that Mr. Kramer's conduct "fell woefully short of applicable standards of care to the Debtor and its estate." The Court agrees with this statement but is unwilling to equate inept representation with contempt of court. In *In re Krisle,* 54 B.R. 330, 345 (Bankr.D.S.D.1985), the court held the debtor's attorney in contempt for advising his client to disobey the court's order to turn over cash collateral. The facts of the instant case, however, are quite different from those of *Krisle.* In the instant case, Mr. Kramer never advised his clients to use cash collateral or to otherwise disobey the orders of this Court. Mr. Kramer's apparently contemptuous conduct consisted not of acts of commission but acts of omission. This distinction is critical. The Court is unwilling to embark upon the slippery slope that would result as a consequence of holding an attorney in contempt for a failure to advise his clients of a Code provision he was unaware they were violating.

When the Motion to Prohibit brought the Debtor's violations to Mr. Kramer's attention, he immediately told Stanley Coven to stop using the Creditor's cash collateral. Subsequent to entry of the Prohibition Order, Mr. Kramer continued to question Stanley Coven regarding the use of cash collateral. When Mr. Kramer learned on September 10 that the Debtor was violating the Prohibition Order, Mr. Kramer immediately informed the Creditor of the violation. Although it would have been appropriate to inform the Court as well, Mr. Kramer's failure to do so does not rise to the level of contempt. His expedient appraisal of the Creditor accomplished the same purpose and tends to support his contentions as to his lack of bad faith.

Finally, the Court finds nothing inappropriate about Mr. Kramer's September 10 letter, wherein he contended that the Creditor's complaint about the use of cash collateral was "not appropriately taken." Because Mr. Kramer admonished his clients against using cash collateral and immediately informed the Creditor when he found out they were doing so, the Court finds Mr. Kramer did not inappropriately "countenance" his clients' transgressions. The September 10 letter fully informed the Creditor of the factual situation; Mr. Kramer's contention that the complaint was not appropriately taken was nothing more than an opinion. As attorney for the Debtor, Mr. Kramer would be expected to interpret the factual scenario in a manner most favorable to his client. Doing so does not constitute contempt of court.

■ At the hearing on the instant motion, Walter Coven ("Walter") testified that he had attended a pre-petition loan renewal meeting with the Creditor and was aware of the Creditor's security interest in the Debtor's accounts receivable and inventory. Walter testified that he held the position of billing clerk with the Debtor (though he had previously testified in deposition that he was the Debtor's office manager throughout the Chapter 11 case, with responsibility for overseeing the Debtor's operations). In any case, Walter testified at the December 30, 1999 hearing that he authorized fuel purchases when Stanley Coven was away and wrote checks on the SouthTrust account. In deposition, he testified that the Debtor purchased approximately one million gallons of fuel between July 23, 1999 and September 15, 1999. At the hearing, he testified that he received payroll payments from the Debtor post-petition and that he was aware that cash collateral was being used to make these payments. Walter testified in deposition that he heard cash collateral could not be used post-petition. He also acknowledged, at the December 30, 1999 hearing, that he was aware of the Prohibition Order and the Debtor's continuing violations, but did nothing to stop them.

■ Stanley Coven ("Stanley") testified at the hearing that he was the sole shareholder of the Debtor and held all officer titles from the debtor's incorporation. He admitted that he was aware of the Credi-

tor's security interest in the Debtor's inventory and accounts receivable and the prohibition on the use of cash but, notwithstanding, allowed the Debtor to use cash collateral throughout the pendency of the Chapter 11 case. He acknowledged that when he walked out of the courtroom on August 6 following the hearing on the Motion to Prohibit, he understood that the undersigned Judge had ordered in no uncertain terms that the Debtor was not to use cash collateral to purchase fuel. Stanley further testified that he could not remember what efforts he made to comply with the undersigned Judge's order. He stated that Walter wrote the checks, but he admitted that he never intervened to stop his son from buying fuel. He attempted to justify the Debtor's violations by contending that the money was going "back into the business." At his deposition, Stanley invoked the Fifth Amendment privilege against self-incrimination when questioned about use of cash collateral.

■ The Court finds the case of *In re Spanish River Plaza Realty Co., Ltd.,* 155 B.R. 249 (Bankr.S.D.Fla.1993), instructive with regard to the instant motion.

A party seeking a civil contempt order must prove by clear and convincing evidence that the respondents have violated a court order. Intent is not an element of civil contempt.

Civil contempt is a remedial sanction and is designed to obtain compliance with court orders or to compensate for damages resulting from non-compliance. Contempt is an appropriate means of redressing cash collateral violations.

. . . .

Among the remedies available to the Court in a civil contempt proceeding is the ability to impose a fine payable to the complainant in compensation for damages sustained as a result of the contumacious conduct.

*Id.* at 253–54 (citations omitted).

In *Spanish River,* Judge Mark found the debtor in contempt for violating the court's cash collateral order but did not address whether the debtor was also in contempt for violating Section 363. This issue is critical in the instant case because, if the Court were to hold the Covens in contempt only for violation of the Prohibition Order, then compensatory sanctions would not encompass any damages that occurred post-petition but pre-Prohibition Order. In *Centerre Bank Nat'l Ass'n v. Continental Marine Corp.,* 35 B.R. 990 (Bankr.E.D.Mo.1984), the court opined that a debtor could not be held in contempt for violation of Section 363(c)(2) and (4) before entry of a court order "bottomed upon those provisions." *Id.* at 992. The court reasoned that the protections afforded by Section 363(c) are not as important as those afforded by Section 362 and that judicial contempt could therefore result from violation of the latter but not the former. *See id.* at 991.

■ This Court respectfully disagrees with the *Centerre Bank* court's conclusion. This Court makes no determination as to which Code Section is more important but concludes that the protections afforded by Section 363(c) are sufficiently important to warrant a finding of contempt when the provision is violated. To hold otherwise would be to allow debtors-in-possession to violate Section 363(c) unless and until the court enters an order effectuating the Code provision. The Court is not aware of any authority indicating that Code provisions are not self-effectuating unless the provision states otherwise. Such a construction would reduce Section 363(c) to a provision granting bankruptcy courts discretion to enter an order prohibiting use of cash collateral, when requested by a creditor or party in interest, but otherwise allowing debtors-in-possession to do with impunity exactly what the Code provision says they cannot do.

■ Bankruptcy courts have inherent power to hold parties in contempt, as well as an implied statutory power pursuant to 11 U.S.C. § 105. *See In re Esposi-*

*to,* 119 B.R. 305, 307 (Bankr.M.D.Fla. 1990). Finding that the Creditor has established by clear and convincing evidence that the Debtor, Walter Coven, and Stanley Coven violated both Section 363(c)(2) and the Prohibition Order, resulting in damages to the Creditor, the Court holds Walter Coven and Stanley Coven in contempt of court. The Court will grant compensatory sanctions against Walter Coven and Stanley Coven in the amount of the Creditor's actual loss. *See United Mine Workers of America,* 330 U.S. at 304, 67 S.Ct. 677. Though the Creditor already has proven that it suffered monetary loss, an additional hearing must be held to determine the extent of that loss. Accordingly it is

ORDERED as follows:

1. The Creditor's Motion for Contempt against Marvin Kramer is denied.

2. The Creditor's Motion for Contempt against Walter Coven is granted.

3. The Creditor's Motion for Contempt against Stanley Coven is granted.

4. An evidentiary hearing to determine the precise amount of monetary damages suffered by the Creditor as a result of the contemptuous actions of Walter Coven and Stanley Coven shall be held on March 27, 2000 at 9:30 A.M. in Courtroom 6, Room 312, Paul G. Rogers Federal Building, 701 Clematis Street, West Palm Beach, Florida.